## WALLACE *v.* UNITED STATES.

ERROR  TO  THE  DISTRICT  COURT  OF  THE  UNITED  STATES  FOR  THE
DISTRICT  OF  KANSAS.

No. 731.   Submitted March 2, 1896. — Decided April 20, 1896.

W. lived on a tract of land next to one owned and occupied by his father in
law Z., concerning the boundary between which there was a dispute be-
tween them.   While W. was ploughing his land, Z., being then under the
influence of liquor, entered upon the disputed tract and brought a quan-
tity of posts there, for the purpose of erecting a fence on the line which
he claimed.   W. ordered him off, and continued his ploughing.   He did
not leave, and W. after reaching his boundary with the plough, unhitched
his horses and put them in the barn.   In about half an hour he returned
with a gun, and an altercation ensued, in the course of which W. was
stabbed by a son of Z. and Z. was killed by a shot from W.'s gun..   W. was
indicted for murder.   On the trial evidence was offered in defence, and
excluded, of threats of Z. to kill W.; and W. himself was put upon the
stand and, after stating that he did not feel safe without some protection
against Z., and that Z. had made a hostile demonstration against him, was
asked, from that demonstration what he believed Z. was about to do ?
This question was ruled out.   *Held,* that if W. believed and had reason-
able ground for the belief that he was in imminent danger of death or
great bodily harm from Z. at the moment he fired, and would not have
fired but for such belief, and if that belief, founded on reasonable ground,
might in any view the jury could properly take of the circumstances
surrounding the killing, have excused his act or reduced the crime from
murder to manslaughter, then the evidence in respect of Z.'s threats was
relevant and it was error to exclude it ; and it was also error to refuse
to allow the question to be put to W. as to his belief based on the demon-
stration on Z.'s part to which he testified.

Where a difficulty is intentionally brought on for the purpose of killing the deceased, the fact of imminent danger to the accused constitutes no defence; but where the accused embarks in a quarrel with no felonious intent, or malice, or premeditated purpose of doing bodily harm or killing, and under reasonable belief of imminent danger he inflicts a fatal wound, it is not murder.

JERRY Wallace was convicted, at the May term, 1895, of the District Court of the United States for the District of Kansas, of the murder of Alexander Zane, on March 7, 1895, at the Wyandotte Indian reservation, and sentenced to be hanged.

The evidence tended to show that Wallace had lived on that reservation, for four years, on a piece of land owned by his wife, Jane, a daughter of Alexander Zane, to whom he was married in 1891. Ill feeling had for a long time existed between Zane and Wallace, growing out of a dispute between them as to the true boundary line of the land owned or claimed by Jane Wallace, and on which she resided, and the land of Julia, a minor daughter of Alexander Zane. Surveys had been made and patents had issued, but the true boundary line, if established by the surveys, had not been accepted by the parties. March 7, 1895, about seven o'clock in the morning, Alexander Zane, accompanied by his son, Noah, who was about fifteen years of age, and three other parties, proceeded with two wagons loaded with posts from his farm to the land on which Wallace resided, and entered the field occupied by Wallace, which he was at that moment engaged in ploughing, through a gap in the fence made by Alexander Zane, and went across it to the fence on the eastern side, and there began to unload the posts and to plant or drive them into the ground along the fence line which they proposed to establish. Wallace and one Denmark were engaged in ploughing the field, being in different parts and moving in opposite directions. As Zane and his party entered the field and were crossing it, Wallace was ploughing towards its eastern side, which he had reached, and was returning when Zane and his party passed about fifty or sixty yards from him, moving in a southeasterly course. Wallace had impaired eyesight and did not see Zane until just before he passed, and then called to him saying,

" Alexander Zane, if that is you, take your force and get out of this field," or, as it was put by one or more of the witnesses, " Alexander Zane, I want you to take your mob and get off these premises." There was evidence tending to show that Zane and those who were with him had been drinking, and that they were boisterous, singing and hallooing. Defendant testified : " They were noisy, hollering and singing, and acting as if they were drunk to me, and I guess no doubt was." Zane appears to have made no reply to Wallace, but went on his way. Wallace continued on with his plough until he had reached a ravine that ran north and south through the field, where he halted, unhitched his horses from the plough and took them up to the barn. In about half an hour he returned with a double barrelled shotgun in his hands, passed within a few feet of a group of persons consisting of Denmark, his daughter, one Lewis, and Wallace's wife, and in passing said to his wife, " Now Janie, I want you to order these gentlemen out of here." Mrs. Wallace then ordered Alexander Zane and those who were with him to leave, but they paid no attention to her. Thereupon Wallace ordered Zane to leave and said to him, " Are you going ? " Zane was standing with his right hand on a post he had driven in the ground and his left arm hanging by his side.

Wallace testified: " I asked of him whether he was going or not, and about this time I was struck in the back, and Mr. Zane made a grab like this (indicating), and he was standing with his right hand on the post; about the time I was struck in the back he made this motion (indicating), and says, ' Damn you, I will kill you;' and then my wife hollers or least she says, ' Look out, Jerry ! ' and I fired this gun."

Lafayette Lewis, another witness, testified: " His wife ordered them out, and Jerry also, and he asked Zane if he was going to go, but I never heard Zane say a word, and then he told him the second time, and he looked up towards him, with his left hand on the post, and threw his hand up this way (indicating) and said, ' Damn you, I am going to kill you ! ' . . . When Jerry ordered him the second time, he turned and kind of looked at him and threw his hand up this

way to his bosom and said, 'Damn you, I will kill you!' and at that moment the boy struck Jerry with the knife and Jerry shot him."

Several other witnesses did not see or hear any word or gesture proceed from Zane, but testified that when Wallace said to Zane, "Are you going?" he immediately raised his gun, aimed it at Zane and fired, shooting Zane in the left breast; that Zane walked off about thirty feet and fell, and when those nearest him reached him he was dead; that when Wallace fired his gun at Zane, Noah Zane ran up and stabbed him in the shoulder with a pocket knife, whereupon Wallace turned and pointed his gun at Noah and the gun snapped. When Zane fell, Noah went to him and took from his person a tomahawk or small hatchet, which was the only thing in the way of a weapon found on him.

There was evidence to the effect that the wound thus inflicted on Wallace penetrated about half an inch, bled considerably, was much swollen, and that his stomach was black and blue as though he had been hit with something, as he testified that he was.

Evidence was also adduced that Zane was in the habit of carrying a butcher knife with him in his belt; that he was quarrelsome; and that Wallace had the reputation of being a peaceable and quiet man. In reference to the survey under which Zane claimed, testimony was given tending to show, as was contended, that Zane caused the disputed line to be so run by the chainmen as to gain four feet, and that Zane said "when he got through with the land he wouldn't leave Jerry Wallace a garden spot; that he could haul it away in a wagon box."

Defendant offered to prove by R. C. Patterson that the day before the shooting occurred he had a conversation with Zane, "in which Zane said to him that he was going down there to build a fence across this property of Wallace's the next day, and if Jerry Wallace fooled with him he would kill the blind son of a bitch." This was objected to, the objection sustained and defendant excepted. Also, that in the same conversation Zane stated that he had got some whiskey "for the purpose of

bracing himself up for the purpose of building this fence across the land of this defendant, Jerry Wallace." Plaintiff objected, the court sustained the objection and defendant excepted.

Defendant further offered to prove by Charles Luke that he had a conversation with Zane the day before the killing, and "Alex. Zane said to this witness that he was going down to build a fence across Wallace's land, and that if Jerry Wallace interfered with him he would kill him, or shoot the blind son of a bitch," and that all these threats were communicated to Wallace. Plaintiff objected, the objection was sustained and defendant excepted.

Defendant offered to prove by Mrs. Alice Sargent that somewhere near the middle of February, 1895, she had a conversation with Zane, on which occasion " Alex. Zane said to this woman and threatened that he would kill Jerry Wallace, and that he had a knife that he was carrying at that time for that purpose, and that these threats were communicated to Jerry Wallace by this witness afterwards." This was objected to, the objection sustained and defendant excepted. A similar offer of proof by one Taylor was made and a similar exception taken. Defendant also offered to prove by Samuel Collins " that at a time shortly before the 7th of March last he met Alexander Zane and had a conversation with Alexander Zane about Jerry Wallace, and that in that conversation he threatened to kill Jerry Wallace, and that he said to this witness that he at one time made him look down the muzzle of a double barrelled shotgun and he wished he had killed him at that time, and that these threats were communicated to the defendant." An offer to prove similar threats prior to the homicide by Mary Crow was made; excluded and exception taken.

When the defendant was on the stand he testified that he took the gun into the field because he was afraid of the party, and especially of Alexander Zane, and did not feel safe without some protection. The following questions were put and ruling made: " Q. You may state, Mr. Wallace, what Zane did at that time, just before you fired the shot. A. He just

took his hand something like this (indicating) saying, 'Damn you, I will kill you.' Q. You may state to the jury from that demonstration what you believed Zane was about to do." To this question plaintiff objected, the objection was sustained and defendant excepted.

Various errors were assigned in respect of the jurisdiction of the court; the sufficiency of the indictment; the want of due service of the list of jurors; and instructions given and refused.

*Mr. John D. Hill* and *Mr. James H. Pratt* for plaintiff in error.

*Mr. Solicitor General* for defendants in error.

MR. CHIEF JUSTICE FULLER, after stating the case, delivered the opinion of the court.

If Jerry Wallace believed and had reasonable ground for the belief that he was in imminent danger of death or great bodily harm from Zane at the moment he fired, and would not have fired but for such belief, and if that belief, founded on reasonable ground, might in any view the jury could properly take of the circumstances surrounding the killing, have excused his act or reduced the crime from murder to manslaughter, then the evidence in respect of Zane's threats was relevant and it was error to exclude it; and it was also error to refuse to allow the question to be put to Wallace as to his belief based on the demonstration on Zane's part to which he testified.

Where a difficulty is intentionally brought on for the purpose of killing the deceased, the fact of imminent danger to the accused constitutes no defence; but where the accused embarks in a quarrel with no felonious intent, or malice, or premeditated purpose of doing bodily harm or killing, and under reasonable belief of imminent danger he inflicts a fatal wound, it is not murder. Whart. Hom. § 197; 2 Bish. Cr. L. §§ 702, 715; 4 Am. and Eng. Ency. Law, 675; *State* v. *Part-*

*low*, 90 Missouri 608; *Adams* v. *People*, 47 Illinois, 376; *State* v. *Hays*, 23 Missouri, 287; *State* v. *McDonnell*, 32 Vermont, 491; *Reed* v. *State*, 11 Tex. App. 509.

In *Adams* v. *People*, it was ruled by the Supreme Court of Illinois, speaking through Mr. Chief Justice Breese, that where the accused sought a difficulty with the deceased for the purpose of killing him, and in the fight did kill him, in pursuance of his malicious intention, he would be guilty of murder, but if the jury found that the accused voluntarily got into the difficulty or fight with the deceased, not intending to kill at the time, but not declining further fighting before the mortal blow was struck by him, and finally drew his knife and with it killed the deceased, the accused would be guilty of manslaughter, although the cutting and killing were done in order to prevent an assault upon him by the deceased or to prevent the deceased from getting the advantage in the fight.

In *Reed* v. *State*, the Court of Appeals of Texas, in treating of the subject of self defence, said : " It may be divided into two general classes, to wit, perfect and imperfect right of self defence. A perfect right of self defence can only obtain and avail where the party pleading it acted from necessity, and was wholly free from wrong or blame in occasioning or producing the necessity which required his action. If, however, he was in the wrong — if he was himself violating or in the act of violating the law — and on account of his own wrong was placed in a situation wherein it became necessary for him to defend himself against an attack made upon himself, which was superinduced or created by his own wrong, then the law justly limits his right of self defence, and regulates it according to the magnitude of his own wrong. Such a state of case may be said to illustrate and determine what in law would be denominated the imperfect right of self defence. Whenever a party by his own wrongful act produces a condition of things wherein it becomes necessary for his own safety that he should take life or do serious bodily harm, then indeed the law wisely imputes to him his own wrong and its consequences, to the extent that they may and should be considered in determining the grade of offence, which

but for such acts would never have been occasioned. . . . How far and to what extent he will be excused or excusable in law must depend upon the nature and character of the act he was committing, and which produced the necessity that he should defend himself. When his own original act was in violation of law, then the law takes that fact into consideration in limiting his right of defence and resistance whilst in the perpetration of such unlawful act. If he was engaged in the commission of a felony, and, to prevent its commission, the party seeing it or about to be injured thereby makes a violent assault upon him, calculated to produce death or serious bodily harm, and in resisting such attack he slays his assailant, the law would impute the original wrong to the homicide and make it murder. But if the original wrong was or would have been a misdemeanor, then the homicide growing out of or occasioned by it, though in self defence from any assault made upon him, would be manslaughter under the law."

After quoting from these and other cases, Sherwood, J., delivering the opinion of the Supreme Court of Missouri in *State* v. *Partlow*, remarked : "Indeed, the assertion of the doctrine that one who begins a quarrel or brings on a difficulty with the felonious purpose to kill the person assaulted, and accomplishing such purpose, is guilty of murder, and cannot avail himself of the doctrine of self defence, carries with it, in its very bosom, the inevitable corollary, that if the quarrel be begun without a felonious purpose; then the homicidal act will not be murder. To deny this obvious deduction is equivalent to the anomalous assertion that there can be a felony without a felonious intent ; that the act done characterizes the intent, and not the intent the act."

In this case it is evident that Wallace was bent as far as practicable on defending his possession against what he regarded and the evidence on his behalf tended to show was an unwarrantable invasion. But a person cannot repel a mere trespass on his land by the taking of life, or proceed beyond what necessity requires. When he uses in the defence of such property a weapon which is not deadly, and

death accidentally ensues, the killing will not exceed man-slaughter, but when a deadly weapon is employed it may be murder or manslaughter, according to the circumstances. 1 Hale P. C. 473 ; 1 Hawk. P. C. c. 31, §§ 34, *et seq.*; Foster, 291; *Davison* v. *People*, 90 Illinois, 221; *People* v. *Payne*, 8 California, 341; *Carroll* v. *State*, 23 Alabama, 28; 1 Whart. C. L. § 462, and cases cited.

Whether the killing with a deadly weapon may be reduced in any case to manslaughter when it is the result of passion excited by a trespass with force to property, we need not consider, as the question, perhaps in view of the interval of time during which Wallace was seeking his gun, does not seem to have been raised. Conceding, though without inti-mating any opinion on the facts disclosed, that Jerry Wallace committed a crime, still the inquiry arose as to the grade of the offence, and, in respect of that, the threats offered to be proven had an important, and it might be decisive bearing, nor was the mere fact that Wallace procured the gun as stated in itself sufficient ground for their exclusion.

In *Gourko* v. *United States*, 153 U. S. 183, this court held that it was error to instruct a jury that preparation by arming, although for self defence only, could not be fol-lowed, in any case, by manslaughter, if the killing after such arming was not, in fact, necessarily in self defence; and that if, under the circumstances on the occasion of the killing, the crime were that of manslaughter, it was not converted into murder by reason of the accused having previously armed himself.

In *Beard* v. *United States*, 158 U. S. 550, 563, it was said: " In our opinion, the court below erred in holding that the accused, while on his premises, outside of his dwelling-house, was under a legal duty to get out of the way, if he could, of his assailant, who, according to one view of the evidence, had threatened to kill the defendant, in execution of that purpose had armed himself with a deadly weapon, with, that weapon concealed upon his person went to the defendant's premises, despite the warning of the latter to keep away, and by word and act indicated his purpose to attack the accused. The de-

fendant was where he had a right to be, when the deceased advanced upon him in a threatening manner, and with a deadly weapon; and if the accused did not provoke the assault and had at the time reasonable grounds to believe, and in good faith believed, that the deceased intended to take his life or to do him great bodily harm, he was not obliged to retreat, nor to consider whether he could safely retreat, but was entitled to stand his ground and meet any attack made upon him with a deadly weapon, in such way and with such force as, under all the circumstances, he, at the moment, honestly believed, and had reasonable grounds to believe, was necessary to save his own life or to protect himself from great bodily injury."

In *Allison* v. *United States*, 160 U. S. 203, it was held that in charging the jury on a capital trial in respect of the possession of a deadly weapon by the accused, it was error to ignore evidence indicating that such possession was for an innocent purpose. The subject of threats was there somewhat considered and authorities cited.

Necessarily it must frequently happen that particular circumstances qualify the character of the offence, and it is thoroughly settled that it is for the jury to determine what effect shall be given to circumstances having that tendency whenever made to appear in the evidence.

In *Stevenson* v. *United States*, 162 U. S. 313, we said:

"The evidence as to manslaughter need not be uncontradicted or in any way conclusive upon the question; so long as there is some evidence upon the subject, the proper weight to be given it is for the jury to determine. If there were any evidence which tended to show such a state of facts as might bring the crime within the grade of manslaughter, it then became a proper question for the jury to say whether the evidence were true and whether it showed that the crime was manslaughter instead of murder. . . . The evidence might appear to the court to be simply overwhelming to show that the killing was in fact murder and not manslaughter, or an act performed in self defence, and yet, so long as there was some evidence relevant to the issue of manslaughter, the

credibility and force of such evidence must be for the jury, and cannot be matter of law for the decision of the court.

"By section 1035 of the Revised Statutes of the United States it is enacted that 'in all criminal causes the defendant may be found guilty of any offence, the commission of which is necessarily included in that with which he is charged in the indictment, or may be found guilty of an attempt to commit the offence so charged: *Provided*, That each attempt be itself a separate offence.' Under this statute a defendant charged in the indictment with the crime of murder may be found guilty of a lower grade of crime, viz., manslaughter. There must, of course, be some evidence which tends to bear upon that issue. The jury would not be justified in finding a verdict of manslaughter if there were no evidence upon which to base such a finding, and in that event the court would have the right to instruct the jury to that effect. *Sparf* v. *United States*, 156 U. S. 51. . . . Manslaughter at common law was defined to be the unlawful and felonious killing of another without any malice, either express or implied. Whart. Am. Cr. L. (8th ed.) sec. 304. Whether there be what is termed express malice or only implied malice, the proof to show either is of the same nature, viz., the circumstances leading up to and surrounding the killing. The definition of the crime given by section 5341 of the Revised Statutes of the United States is substantially the same. The proof of homicide, as necessarily involving malice, must show the facts under which the killing was effected, and from the whole facts and circumstances surrounding the killing the jury infers malice or its absence. Malice in connection with the crime of killing is but another name for a certain condition of a man's heart or mind, and as no one can look into the heart or mind of another, the only way to decide upon its condition at the time of a killing is to infer it from the surrounding facts, and that inference is one of fact for a jury. The presence or absence of this malice or mental condition marks the boundary which separates the two crimes of murder and manslaughter."

Treating the excluded evidence as admitted, and assuming that Wallace would have testified that he believed from Zane's

demonstration that Zane intended to kill him, the evidence on defendant's behalf tended to establish bad feeling between Zane and Wallace in reference to the line between Mrs. Wallace's land and that of Julia Zane; an attempt on Zane's part to include a part of Mrs. Wallace's land in the Zane parcel; declarations by Zane the day before the homicide that he was going the next day to run a fence across what Wallace claimed to be his land, and threats that, if Wallace interfered with him in so doing, Zane would kill him, all communicated to Wallace before the homicide; previous threats also communicated that he would kill Wallace; forcible entrance by Zane, accompanied by several others, into the field claimed by Wallace, in which he was ploughing, and fencing off part of it commenced; boisterous and disorderly manifestations on their part and refusals by Zane to leave when ordered to go; such demonstrations by Zane at the moment as induced Wallace to believe that he was in imminent danger, and action based on that belief. Granting that the jury would have been justified in finding that Wallace's intention in going for the gun and returning with it as he did was to inflict bodily harm on Zane if he did not leave, still the presumption was not an irrebuttable one. and it was for the jury to say whether Wallace's statement that he procured the gun only for self protection was or was not true. And if they believed from the evidence that this was true, and that the killing was under reasonable apprehension of imminent peril, then it was for the jury to determine under all the facts and circumstances whether Wallace had committed the offence of manslaughter, rather than that of murder, if he could not be excused altogether.

We think that the threats were admissible in evidence, and, this being so, that the question as to Wallace's belief should not have been excluded. It has been often decided that where the intent is a material question, the accused may testify in his own behalf as to what his intent was in doing the act. *People* v. *Baker*, 96 N. Y. 340; *State* v. *Banks*, 73 Missouri, 592; *Thurston* v. *Cornell*, 38 N. Y. 281; *Over* v. *Schiffling*, 102 Indiana, 191; *People* v. *Quick*, 51 Michigan,

547; *Fenwick* v. *Maryland*, 63 Maryland, 239. In the latter case -it was held that a person on trial for an assault with intent to commit murder is competent to testify as to the purpose for which he procured the instrument with which he committed the assault.

This rule is not controverted, but it is contended that Wallace's belief was immaterial. For the reasons given we cannot concur in that view and are of opinion that the witness should have been allowed to answer.

It is unnecessary to pass upon any of the other points raised on behalf of plaintiff in error.

*Judgment reversed and cause remanded with a direction to set aside the verdict and grant a new trial.*