## WILLIAMS v. STATE.

### Opinion delivered October 2, 1911.

1.  VENUE—DENIAL OF CHANGE.—It is proper for a trial judge to examine the supporting witnesses to a motion for change of venue touching their knowledge of the subject-matter; and it is not an abuse to refuse such motion when it appears that such witnesses did not possess definite information as to the state of mind of the inhabitants of the county toward the defendant.   (Page 221.)

2.  INSTRUCTIONS—REPETITION.—The court's refusal to give instructions asked by defendant was not prejudicial if such instructions were in effect fully covered by the instructions given.   (Page 222.)

3.  HOMICIDE—INSTRUCTION—EQUALITY BEFORE THE LAW.—It was not prejudicial error, in a murder case, for the court to refuse to instruct the jury that the fact that the deceased was a white man and the defendant a negro should not be allowed any weight in their decision. (Page 225.)

4.  TRIAL—IMPROPER ARGUMENT.—In the closing argument in a murder case, the prosecuting attorney, in referring to the defendant, said: "I shall not refer to his nervousness, but his lawyer, who is a student of human nature, knew in his own mind that he wasn't telling the truth, although he is an insolent-looking individual; that he sat there like a dog with a struggling sheep, and dared not look an honest man in the face." *Held* that the remarks were improper, but not prejudicial   (Page 225.)

Appeal from Pulaski Circuit Court, First Division; *Robert J. Lea,* Judge; affirmed.

*X. O. Pindall,* for appellant.

1.   The proper application of the rule allowing the examination of supporting witnesses to a motion for a continuance depends upon the particular facts in the case. The notoriety given to this case by newspaper accounts, all of which were unfavorable to the defendant, and by discussion of the same on the streets, etc., necessarily resulted in many expressions of opinion unfavorable to the defendant. Who can say that the supporting witnesses were reckless or false in their statements that the defendant could not obtain a fair and impartial trial on account of the prejudice against him? 98 Ark. 139; 22 *Id.* 283; 83 Ark. 36; 80 Ark. 360.

2.   Instructions 6 and 7, requested by the defendant, should have been given, and the court's refusal to give the same amounted to withholding from the jury the proper consideration of the issue of manslaughter. 162 U. S. 313, 40 L. Ed. 980; 74 Ark. 453, 456; 162 U. S. 466, 40 L. Ed. 1039.

*Hal L. Norwood*, Attorney General, and *William H. Rector*, Assistant, for appellee.

1. It has often been held that the trial court may examine the supporting witnesses for the purpose of testing their credibility and to discover the extent of the information upon which they base their affidavits; and that where the testimony of such witnesses develops the fact that they have heard persons from only one or two communities discuss the case, and that they did not know the general consensus of opinion, it is not error to overrule the motion for change of venue. Cases cited by appellant, and 85 Ark. 518; 76 Ark. 276; 86 Ark. 357; 91 Ark. 65; 54 Ark. 243; 71 Ark. 180.

2. The court, having already fully instructed the jury on the questions of manslaughter and self-defense, did not err in refusing instructions 6 and 7 requested by appellant. 54 Ark. 4.

FRAUENTHAL, J. Defendant, Will Williams, was indicted for the crime of murder in the first degree, charged with murdering one J. O. Miller by shooting him with a pistol. He was convicted of murder in the second degree by a petit jury, who assessed his punishment at twenty-one years in the State penitentiary. There are three assignments of error which are specially urged by him why the judgment of conviction should be reversed: (1). Because the court erred in refusing to grant him a change of venue; (2). On account of errors committed in rulings upon the instructions; (3). Because of improper remarks made by the attorney for the State in his argument to the jury.

The deceased was a policeman of the city of Little Rock, and the defendant was a negro, who had moved to said city some months prior to the killing. For some time before the homicide the defendant had been keeping company with a colored woman named Martha Neighbors, who was employed as a cook by one Russell Miller, in said city. She lived in a room on the premises of said Miller, and at the rear of the residence. The homicide occurred on the night of April 23, 1911, on said premises. Prior to that time, defendant and this woman had had one or two difficulties; and about 9 or 10 o'clock of that night she saw him down in the city, where, as she

expressed it, "he had tried to fool with her," but had not injured her. She returned to the premises of Mr. Miller, and, not having the key to her room, she sat down on the porch to wait for one John Ham, a colored man who worked around the Miller premises, and who had the key. About 11 o'clock of that night while she was sitting on the steps of the porch, the defendant came up with a pistol, and putting his hand upon her head, said, "What in the h—— are you doing sitting out here?" She replied that she was doing nothing, and asked the defendant what he was doing there at that time of night, and he replied, "That is none of your d—— business."

In a short time John Ham returned, and the three then went into the woman's room. After a time, the woman said to the defendant that she wished that he would go home, and said that he must be looking for trouble. Shortly after this, Mr. Russell Miller returned to his residence, and rang the door bell, and this woman then left her room, and went to him, and told him that the defendant had a pistol, and that she was afraid of him. Mr. Miller then telephoned to the police headquarters for an officer, and the deceased and another policeman, named F. C. Brown, were sent to his aid. When they arrived, Mr. Miller told them that the defendant was trying to kill his cook, and that he desired them to protect her.

The testimony on the part of the State tended to prove that the officers then went to the rear of the residence where the woman's room was located, and, it being dark, they lighted a match or two at the gate near the door of this room in order to open same. In the meanwhile, the defendant had stationed himself in the door of the room, and when the officers came near where he was, Brown said, "Now, I want you;" and as he reached up the defendant immediately fired a shot, which struck the deceased in the neck, causing his instant death. After the defendant fired the first shot, Brown began to fire, but did not draw his pistol until after the defendant had fired the first shot. Deceased's pistol was found afterwards upon his person, and it had not been discharged. The defendant fled from the scene, and made his escape, and later was captured in a distant county.

The defendant testified that when the officers approached he did not know who they were, and did not fire upon them

until they had first fired upon him two or three times. He also stated that he fired his pistol twice, but only to protect himself because he was afraid.

The defendant filed a petition for a change of venue, upon the ground that the minds of the inhabitants of Pulaski County, where the crime was committed, were so prejudiced against him that he could not obtain a fair and impartial trial therein. This motion was supported by the affidavits of two persons. The court examined these affiants under oath, in order to test their credibility and to discover their knowledge as to the state of the minds of the inhabitants of the county concerning the defendant. Each of them had talked with two or three persons in the city of Little Rock, who had expressed an opinion that the defendant ought to be hung, or that he would be lynched if the people "got a chance at him." One of these affiants also heard one person say that he supposed that the defendant would be "railroaded through." But these affiants had not heard any other person in any other locality in the city or county give any expression relative to the case or the defendant. The examination showed that these affiants based their opinion upon statements made by two or three persons, living in as many localities in the city of Little Rock, and that they did not know the general sentiment of the inhabitants throughout the county, or even throughout the city. The information obtained by these affiants relative to the sentiment of the people concerning the defendant was not sufficient to form an opinion of the state of mind of the inhabitants of the county, so that they could say that the inhabitants thereof were so prejudiced against the defendant that he could not obtain a fair and impartial trial in the county.

It has been repeatedly held by this court that it is proper for a trial judge to examine the supporting witnesses to a motion for a change of venue touching their knowledge of the subject-matter of their affidavits, and that it is not an abuse of discretion to refuse such motion when it appears that said supporting affiants had knowledge only as to expressions of persons in one or two localities in the county and were not informed as to the state of mind of the inhabitants of the county to a more general extent.

From an examination of the two supporting witnesses

in this case, the trial court found that they did not possess definite and sufficient information as to the state of mind of the inhabitants of the county towards the defendant, and denied the change of venue. In this action of the court we find no reversible error. *Price* v. *State*, 71 Ark. 180; *White* v. *State*, 83 Ark. 36; *Kinslow* v. *State*, 85 Ark. 518; *Bryant* v. *State*, 95 Ark. 239.

It is earnestly insisted by counsel for the defendant that the court erred in refusing to give certain instructions requested by him relative to the crime of manslaughter. These instructions in effect stated that manslaughter differed from murder in that in murder the element of malice always exists, whereas manslaughter is the unlawful killing of a human being without malice, but under such circumstances that the slayer was actuated by a passion caused by a provocation apparently sufficient to make the passion irresistible, or, believing himself in imminent danger from assault with a deadly weapon, he acted too hastily and without due care, but without malice. One of these instructions requested by him is as follows:

"7.    And you are further instructed that if you find from the evidence that the defendant Williams was approached in a sudden and unusual manner by witness Brown, and the deceased Miller, and that, acting together, one or both of them drew a pistol, or their pistols, and began firing upon the defendant, and that under these circumstances the defendant shot, not in a heat of passion, but because he in good faith, believed he was in danger of assault with a deadly weapon, even though the jury believed he acted too hastily and without due care, yet if there was no malice, they should convict him of manslaughter and not of murder."

We are of the opinion that the court did not commit prejudicial error in refusing these instructions requested by the defendant, for the reason that in its charge to the jury it sufficiently instructed them with reference to the crime of manslaughter. The court instructed the jury that:

"Manslaughter is the unlawful killing of a human being without malice, express or implied, and without deliberation. Manslaughter must be voluntary, upon a sudden heat of passion, caused by a provocation apparently sufficient to make the passion irresistible. That is voluntary manslaughter.

If the killing be in the commission of an unlawful act, without malice and without the means calculated to produce death, or in the prosecution of a lawful act done without due caution and circumspection, it shall be manslaughter; that is, involuntary manslaughter."

The court further instructed the jury: "In order to convict the defendant, he should be guilty of a felonious homicide, and that would be either murder in the first degree, murder in the second degree, voluntary manslaughter or involuntary manslaughter, according to the circumstances under which the act was done. In other words, if he exceeds his right of self-defense, and went beyond what was apparently necessary to him under the circumstances, he would be responsible for his act, and it would be an unlawful killing, a felonious homicide, and would be murder in the first degree, murder in the second degree, manslaughter, voluntary or involuntary, according to the circumstances. Murder in the first degree, if it was with the intention to kill, with deliberation, premeditation and malice aforethought. If nothing but malice aforethought appears, it would be murder in the second degree. If done in the heat of passion caused by a provocation apparently sufficient to make the passion irresistible, it would be voluntary manslaughter. If it was done without any intention of killing, but was done without due caution and circumspection in the exercise of his right of self-defense, and he acted beyond what was apparently necessary to protect him, and there was no intent to kill, and no malice, no premeditation and deliberation, it would be involuntary manslaughter."

It is urged that if the killing was induced by fear the grade of the homicide would be reduced from murder to manslaughter, the same as if it was done in a sudden heat of passion. And it is claimed that the instructions as given by the court did not present this phase of the case to the jury.

The grade of a homicide may be reduced from murder to manslaughter by reason of passion caused by a provocation apparently sufficient to make the passion irresistible. The passion may consist of anger or sudden resentment, or fear or terror. These are the causes from which the passion springs; and whether induced by the one or the other of these causes, it will reduce the grade of the homicide from murder to man-

slaughter. It is perfectly proper to show that in a given case the passion did exist, for the reason that it was induced by anger suddenly aroused, fear or terror; and it would not be improper to instruct the jury that a passion which will reduce the grade of a homicide to manslaughter may be induced by any of these causes. *Stevenson* v. *United States,* 162 U. S. 313; *Wallace* v. *United States,* 162 U. S. 466; *Allison* v. *State,* 74 Ark. 453.

But in the case at bar the court, we think, did cover this phase of the case in its charge to the jury, and even instructed the jury more favorably in behalf of the defendant than requested. In effect, the court charged the jury that if the officers made an assault upon the defendant and commenced discharging their weapons at him, and he feared injury from them on that account, the defendant was entitled to an absolute acquittal. The court charged the jury:

"I will state in this same connection that a man has the same right to protect himself against an unlawful attempted arrest as he would an assault made upon him. The same principle applies in the one case as in the other. If that is the only apparent way to prevent an unlawful arrest, he has a right to go even to the extent of taking the life of the man who tries to do it in an unlawful way or without authority. So, the principles are the same in resisting an unlawful arrest, if one is attempted, as an unlawful assault made upon the person."

And the court charged the jury further: "If it is true that these two officers made an assault upon him, and commenced discharging their weapons upon him, he had a right to protect himself, and even to kill both of them if he could, if that was the only reasonable way he had of saving his own life. Whether that is true, it is for you to determine."

By virtue of these instructions, the court in effect charged the jury that if the officers, Brown and Miller, approached the defendant, and one or both of them drew their pistols and began firing upon the defendant, and that under these circumstances the defendant shot because he in good faith believed he was in danger from assault with a deadly weapon. then he was entitled to an acquittal. Defendant by the above instruction No. 7 in effect requested the court to instruct the jury that under the circumstances detailed above he would

be guilty of manslaughter. The defendant cannot complain if he obtained a more favorable instruction than was requested

It is urged that the court erred in refusing to instruct the jury in effect that the fact that the deceased was a white man and the defendant was a negro could not be allowed to weigh in their decision of the defendant's innocence or guilt, and that the law knew no class, so far as the race question was concerned. We do not think that the court committed any error in refusing to give this instruction. Before the law every one is absolutely equal in his condition. Every person is entitled to every protection which the law gives, and to every safeguard which it affords. While this is true, it is not an error prejudicial to the rights of any individual to refuse to declare to a jury this known principle upon which the administration of justice is based.

The defendant complains of certain remarks made by the attorney for the State in his argument to the jury, and urges that they were prejudicial. In his closing argument, the prosecuting attorney, in referring to the defendant, said: "I shall not refer to his nervousness, but his lawyer, who is a student of human nature, knew in his own mind that he wasn't telling the truth, although he is an insolent looking individual, that he sat there like a dog with a struggling sheep and dares not look an honest man in the face." These statements, we think, were nothing but the expressions of opinion of the prosecuting attorney, put, probably, in improper language They were not statements of fact outside of the evidence. The defendant's appearance, which was referred to by the attorney, was as visible to the jury as to the attorney, and they must have understood that he was only expressing his opinion relative to the credibility and appearance of the defendant.

In the case of *Reese* v. *State*, 76 Ark. 39, it was held that the following remarks made by the attorney for the State in his closing argument to the jury did not constitute reversible error:

"A blind tiger man will swear a lie any time. This man, John F. Reese, is not worthy of belief. Any man who will run a blind tiger will swear to beat the law."

In the case of *Carroll* v. *State*, 71 Ark. 403, it was held that it was not reversible error for an attorney for the prose-

cution to characterize the crime of the defendant as "the most tragic crime ever perpetrated," and the defendant as a murderer. *Byrd* v. *State*, 76 Ark. 286; *James* v. *State*, 94 Ark. 514.

We do not think that the above remarks of counsel for the State, made in this case, although improper, were of such prejudicial nature as to deprive the defendant of a fair trial.

Upon a careful examination of the entire record in this case, we find no prejudicial error which was committed in the trial. The evidence adduced in this case fully sustains the verdict which was returned by the jury, and there was no step taken by the lower court which deprived the defendant of a fair and impartial trial. The judgment is accordingly affirmed.