*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 15-CO-363

CORDELL SMITH, APPELLANT,

V.

UNITED STATES, APPELLEE.

Appeal from the Superior Court
of the District of Columbia
(CF1-8380-07)

(Hon. Geoffrey M. Alprin, Trial Judge;
Hon. Michael Ryan, Motion Judge)

(Submitted  March 6, 2017                    Decided  March 14, 2019)

*David Benowitz* was on the brief for appellant.

*Channing D. Phillips*, United States Attorney at the time the brief was filed, and *Elizabeth Trosman*, *John P. Mannarino*, *Bernard Delia*, and *Jennifer B. Loeb*, Assistant United States Attorneys, were on the brief for appellee.

Before GLICKMAN, FISHER, and THOMPSON, *Associate Judges*.

GLICKMAN, *Associate Judge*:  Appellant Cordell Smith was convicted after a jury trial of second-degree murder while armed and associated firearms offenses. This court affirmed appellant's convictions on direct appeal in an unpublished

opinion.[1] While that appeal was pending, appellant moved for a new trial pursuant to D.C. Code § 23-110 (2012 Repl.), asserting that his trial counsel's ineffectiveness had deprived him of a meritorious defense – namely, that he had committed the homicide in self-defense. The motion judge denied this motion without affording appellant an evidentiary hearing. Before us now is the appeal from that denial. For the reasons that follow, we affirm.

## I.

### A. The Evidence at Trial

Appellant was tried for the fatal shooting of Rayshard Austin. The government's main witnesses were Monica Foster, who witnessed the events that precipitated appellant's encounter with Austin; Sheri Butler, who saw appellant retrieve a gun moments before the two men confronted each other; and Tammy Brown and Tremayne Morant, each of whom saw appellant shoot Austin. The defense called no witnesses to the shooting, and appellant did not take the stand. Through cross-examination and argument, however, the defense tried to discredit

---

[1] *Smith v. United States*, No. 10-CF-342, Mem. Op. & J. (D.C. Feb. 7, 2012).

the government's witnesses. The theory of the defense was that appellant was not present at the shooting and that it was Tammy Brown who shot and killed Austin.[2]

According to the government's evidence, the shooting took place at about 1:30 a.m. on March 28, 2007, in the stairwell of the Ivy City Apartments building at 1060 Mount Olivet Road in Northeast, D.C. Monica Foster was on the street outside the building that morning, smoking marijuana, when her "godbrother," Rayshard Austin, came by to talk with her. Austin was accompanied by his friends

---

[2] Approximately a year-and-a-half before trial, the government moved in limine to require appellant to make a pretrial proffer of evidence supporting a claim of self-defense before he raised such a claim at trial or elicited any evidence at trial of Austin's prior violent acts. (In a discovery letter, the government had informed the defense that Tammy Brown had implicated Austin in a murder.) The government asserted that no evidence existed of any act of aggression by Austin toward appellant, and that even if there were such evidence, appellant's response to it was excessive. When this motion was taken up at a status hearing, appellant's counsel (who did not represent appellant at trial) stated in an ex parte proffer to the court that he intended to put on an alibi defense, but that he did not want to preclude the possibility of pursuing a theory of self-defense because he had learned through his investigation that Austin was armed with knives when he was killed and that Tammy Brown might say Austin was going to attack appellant. The court granted in part and denied in part the government's motion, ruling that the defense would not be required to make a proffer before presenting argument or evidence at trial that Austin was the initial aggressor, but that the defense would be required to make a proffer outside the presence of the jury before it would be allowed to bring up Austin's prior acts of violence or his reputation or character for violence. No proffer in support of a claim of self-defense was ever made. Neither an alibi defense nor a claim of self-defense was pursued at trial.

Tammy Brown and Delonte Pearson. The three had been drinking and both Austin and Brown were drunk; Foster testified that Austin "reeked of liquor."

At this time, appellant was with Tremayne Morant and a man identified at trial as Daewoo in a laundry room located on the second floor of the Ivy City Apartments building. The laundry room window overlooked the spot where Foster and Austin were chatting. Upon seeing appellant at the window, Brown went into the building to go "chill" with appellant.

From the laundry room window, appellant attempted to flirt with Foster. Austin became annoyed at the interruption, told appellant to stop bothering Foster, and declared in an angry tone of voice that he was going up to the laundry room. Foster tried to restrain him, but Austin climbed over a gate and entered the apartment building.

Upon hearing Austin say he was coming up, appellant, Morant, and Daewoo ran out of the laundry room and down the stairs. Brown also left the laundry room and went to smoke a cigarette in the stairwell. On his way up, Austin stopped to talk with her there.

Meanwhile, appellant ran down to the basement apartment of Sheri Butler and knocked loudly on the door. Butler opened it and appellant told her "he wanted to come get his charger." Appellant walked into the kitchen, where Butler saw him open a drawer and take out a gun. He then left her apartment. Butler locked the door behind him. As she walked back to her bedroom, she heard three gunshots coming from upstairs. Looking out her window, Butler saw appellant, Morant, and a third person get into appellant's car and drive away.

Brown testified that as she was talking with Austin in the stairwell, appellant and his friends came up the steps. Appellant approached Austin, said "what's up," and then shot him three times at close range. Brown did not hear Austin say anything, nor did she see him holding any weapon or making any aggressive movement in appellant's direction. Brown saw Austin stumble towards appellant after the first shot and then step back and "hit the steps" after being shot twice more.

When called to the stand at trial by the prosecution, Morant denied having seen appellant shoot Austin. He claimed not to have been at the Ivy City Apartments on the night of the shooting. His contrary grand jury testimony was thereupon admitted as substantive evidence. Morant told the grand jury that he

was with appellant in the laundry room; that appellant, from the window, got into an argument with Austin in the street below; that Austin said he was "coming around there," entered the building, and went up the stairs; and that appellant meanwhile went downstairs and came back up. Morant witnessed the meeting of the two men. He described Austin as being so intoxicated he could not "even get his words out straight." Morant saw Austin "lift his pants up," and then he saw appellant shoot Austin. He heard three gunshots. Morant did not see anything in Austin's hands.

Immediately after the shooting, appellant ran out of the building with Morant and Daewoo, and Brown started screaming. Foster, who had remained outside, heard the gunshots and then heard Brown shouting, "son, son get up!" Foster and Pearson ran to the stairwell and found Brown alone with Austin's body.

An autopsy determined that Austin received three gunshot wounds to the front of his body – one to the left side of his chest, the second near the midline of his torso, and the third to his right thigh. The toxicology report disclosed that Austin had a blood alcohol level of .2 (indicative of impairment).

The defense called one witness, Metropolitan Police Department Officer Richard Griffin, who identified the physical evidence recovered at the scene of the

shooting.  On the floor under Austin's body, Officer Griffin found the broken-off tip of a knife.  The knife tip fit the broken blade of a folded pocketknife that Griffin found in Austin's right front pants pocket.  Defense counsel argued at trial that Brown, the only person who remained with Austin after the shooting, must have picked up the knife and planted it on Austin after *she*, not appellant, shot him.[3]  Defense counsel did not contend, however, that the knife indicated Austin was the aggressor in the confrontation in which he was killed.[4]

## B.  The § 23-110 Motion

Appellant's § 23-110 motion for relief from his conviction was filed by new counsel during the pendency of his direct appeal.  Appellant charged that his trial counsel, Ross Hecht, was ineffective in failing to investigate, confer with him, and

---

[3]  There was no evidence that Brown's DNA or fingerprints were on the knife.

[4]  If Austin was wielding the knife when he was shot (which might be inferred from the location of the broken blade tip under his body), that does not necessarily mean he was the initial aggressor.  He could have been trying to defend himself.  Under either hypothesis, the blade might have broken when Austin was felled and the knife struck the ground (either while Austin was still gripping it or because he dropped it).  No other explanation has been offered for the broken knife blade.

pursue at trial a "viable" claim that he shot Austin in self-defense.[5] The motion asserted that Austin had threatened appellant and "was taking steps to carry out his threat" when appellant shot him; that Austin "was known to carry a pistol and [was] not afraid to use it;" and that appellant was aware of his reputation for violence. The motion claimed that "[t]he defense of Self Defense would have provided the necessary doubt for the jurors to render a just verdict of not guilty (acquittal)."

Appellant provided an affidavit in support of his motion.[6] Appellant averred that he saw Austin holding "something that looked like a gun or knife" when Austin "came at" him, and that he knew Austin to be "a bad and dangerous guy" who had "killed and shot a few people" and "was wanted in two separate murder investigations." But when appellant told Hecht he was interested in testifying and

---

[5] One of appellant's claims on direct appeal was that the trial court plainly erred in failing to instruct the jury *sua sponte* on self-defense. Recognizing the testimony regarding Austin's pocketknife, this court nonetheless held that "there was no evidence to support a self-defense instruction." *Smith v. United States*, No. 10-CF-342, Mem. Op. & J. at 1 (D.C. Feb. 7, 2012).

[6] Appellant's counsel submitted this affidavit as an exhibit to an "Addendum" to the motion. The Addendum itself essentially repeated verbatim the contents of the original motion and asserted that in a new trial the evidence of self-defense "would likely result in an acquittal."

"wanted to go with self-defense," Hecht allegedly "kept blowing [him] off" and told him "self-defense did not exist" in the District of Columbia.

In opposition, the government argued that appellant's self-defense claim was bereft of factual support. There was, the government asserted, "nothing in the record" suggesting that appellant faced an unlawful and immediate threat from Austin and "honestly and reasonably believed" himself to be in imminent danger of death or serious bodily harm such that his use of deadly force was necessary. Moreover, even assuming that Austin displayed the pocketknife and that appellant might have been justified in using some force to protect himself, "shooting Austin three times and mortally wounding him was clearly excessive" as a matter of law. And in any event, the government argued, appellant forfeited "a legitimate claim of self-defense" by leaving to retrieve a gun from Butler's basement apartment and then returning upstairs to confront Austin instead of taking the opportunity to avoid a violent encounter with him. Given that the record thus conclusively refuted appellant's ineffective assistance claim by showing that appellant "would not have been entitled to pursue self-defense," the government argued that the court should deny appellant's § 23-110 motion without a hearing.

In reply, appellant reiterated his claim that he had not received a fair trial because of the "fundamental failure on the part of trial counsel to communicate with [him] and investigate this case."  Appellant's only rejoinder to the argument that he did not have a legitimate self-defense claim was to re-assert that the "testimony, evidence, and argument of self-defense needed to be heard and considered by the jury," and that "[t]he defense of Self Defense would have provided the necessary doubt for the jurors to render a just verdict of not guilty (acquittal)."

The motion judge denied appellant's § 23-110 motion without an evidentiary hearing.  Even if appellant's factual assertions were true, the judge ruled, the record demonstrated that he was not prejudiced by his trial counsel's alleged deficiencies.  As the judge succinctly explained, appellant's evidentiary proffer fell "far short of raising a reasonable probability of acquittal on a self-defense theory," because – in a nutshell – appellant "left the scene and had a chance to mitigate the danger but instead returned with a gun and shot three times a person who witnesses testified did not show a weapon." [7]

---

[7]  The judge thus found it unnecessary to decide (or conduct an evidentiary hearing to determine) whether Hecht performed deficiently by failing to consider, investigate, and confer with appellant about a possible claim of self-defense. However, based on his assessment that a self-defense claim would not have

*(continued…)*

## II.

A Sixth Amendment ineffective assistance claim is evaluated under the two-part test of *Strickland v. Washington*.[8]  The defendant's "burden [is] to plead with requisite particularity, in light of the full record before the court, [1] that his trial counsel's performance was deficient . . . and [2] that the deficient performance prejudiced his defense."[9]  Failure to satisfy either prong defeats the claim; the court is not required "to address both components of the inquiry if the defendant makes an insufficient showing on one.  In particular, a court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies."[10]

---

*(…continued)*
succeeded, the judge opined that the choice of a different theory of defense was reasonable.

[8]  466 U.S. 668 (1984); *see also Cosio v. United States*, 927 A.2d 1106 (D.C. 2007) (en banc).

[9]  *Long v. United States*, 910 A.2d 298, 309 (D.C. 2006); *see Strickland*, 466 U.S. at 687; *Cosio*, 927 A.2d at 1122.

[10]  *Strickland*, 466 U.S. at 697.  Indeed, the Court added, "[i]f it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed."  *Id.*

The prejudice prong requires the defendant to make a showing that "counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable."[11]  In this case, that means appellant needed to demonstrate "a reasonable probability" that but for counsel's putative errors, the jury "would have had a reasonable doubt respecting [his] guilt."[12]  The motion judge concluded that even assuming the truth of his factual averments, appellant's proffered showing of prejudice was insufficient as a matter of law.[13]  Our review of that determination is *de novo*.[14]

"[W]here the alleged error of counsel is a failure to advise the defendant of a potential affirmative defense to the crime charged, the resolution of the 'prejudice' inquiry will depend largely on whether the affirmative defense would

---

[11]  *Id.*

[12]  *Id.* at 695; *see also Cosio*, 927 A.2d at 1132.

[13]  A § 23-110 motion may be denied without an evidentiary hearing where the claims presented would not entitle the defendant to relief even if they are factually true; "if no genuine doubt exists about the facts that are *material* to the motion, the court may conclude that no evidentiary hearing is necessary." *Bellinger v. United States*, 127 A.3d 505, 515 (D.C. 2015) (emphasis added) (internal quotation marks omitted); *see also* D.C. Code § 23-110 (c) (2012 Repl.).

[14]  *See Cosio*, 927 A.2d at 1123.

have succeeded at trial."[15]  Appellant contended below that he had a claim of self-defense that reasonably might have persuaded the jury to acquit him of Austin's murder had it not been foreclosed by his counsel's errors.  This would have required him to show that:

> (1) [he was faced with] an actual or apparent threat; (2) the threat was unlawful and immediate; (3) [he] honestly and reasonably believed that he was in imminent danger of death or serious bodily harm; and (4) [his] response was necessary to save himself from the danger.[16]

To demonstrate he could have made such a showing, appellant claimed he would have testified that Austin threatened him with a knife – which would have been corroborated by the broken knife blade found under Austin's body and the pocketknife in his pocket – and that the threat to his life was all the more frightening given his knowledge of Austin's murderous reputation.

Whether there is a reasonable probability that the jury would have credited that testimony may be doubted.  Appellant's account was contradicted by Brown and Morant, each of whom denied seeing Austin threaten appellant or have a weapon in his hands.  Moreover, the evidence suggested Austin was too

---

[15] *Hill v. Lockhart*, 474 U.S. 52, 59 (1985).

[16] *Brown v. United States*, 619 A.2d 1180, 1182 (D.C. 1992).

intoxicated to pose a serious danger to appellant, strengthening the government's argument that appellant's employment of lethal force was excessive.[17]

More important, even assuming the jury would have credited appellant's account, his claim of self-defense was precluded as a matter of law because he deliberately chose to risk the fatal encounter with Austin by arming himself with a deadly weapon and going to confront him. Appellant does not dispute the testimony that he ran from the second floor to Butler's basement apartment, retrieved a gun there, and then returned upstairs to confront Austin. Appellant likewise does not deny that he could have avoided the confrontation by remaining in Butler's apartment or leaving the building. "A legitimate claim of self-defense is not available to a defendant who voluntarily – knowingly and unnecessarily – placed himself in a position where he had reason to believe his presence would provoke the violence from which he then found it necessary to use deadly force to save himself."[18] Still less is such a claim available to a defendant who quit the

---

[17] *See Gay v. United States*, 12 A.3d 643, 648 (D.C. 2011) (noting that jury is instructed that "[e]ven where self-defense is justified, a defendant may not use any greater force than he actually and reasonably believes to be necessary under the circumstances" (internal punctuation omitted) (citing cases)).

[18] *Andrews v. United States*, 125 A.3d 316, 321 (D.C. 2015).

scene of the danger for the sole purpose of arming himself and then "left an apparently safe haven . . . [to] return to the scene."[19]

In short, viewing the proffered evidence in the light most favorable to appellant, it would not have entitled him to an instruction on self-defense.[20] As the defense would not have been available to him and could not have resulted in his acquittal, appellant did not demonstrate *Strickland* prejudice based on counsel's failure to raise it.[21]

Appellant argues, however, that the evidence he proffered would have entitled him to an instruction on the doctrine of "imperfect" self-defense that might have led the jury to find him guilty of voluntary manslaughter instead of second-

---

[19] *Brown*, 619 A.2d at 1182 (quoting *Rowe v. United States*, 370 F.2d 240, 241 (D.C. Cir. 1966)); *see also Outlaw v. United States*, 806 A.2d 1192, 1200 (D.C. 2002) (holding that defendant was not entitled to a self-defense instruction where he "walked away from a confrontation with [the victim], went to a truck, retrieved a gun, and returned to shoot [the victim]").

[20] *See Brown*, 619 A.2d at 1182 ("In determining whether a self-defense instruction was properly denied, the evidence must be reviewed in the light most favorable to the defendant.").

[21] *See Washington v. United States*, 689 A.2d 568, 573 (D.C. 1997) (holding that where the evidence at trial does not support instruction on a defense, counsel's failure to ask for the instruction is not deficient performance, "[n]or can [the defendant] show he was prejudiced by this failure").

degree murder. The motion judge did not address this argument because appellant never made it in the proceedings below. Indeed, he did not mention imperfect self-defense at all in those proceedings. The government argues that appellant thereby waived the claim. Appellant responds that, by asserting he acted in self-defense, he implicitly invoked both varieties of self-defense, perfect and imperfect. This rejoinder misses the mark, however, for *Strickland* places the burden on appellant to explain how he was prejudiced, not on the court to intuit the answer to that question.[22]

As this court often has said, "while an appellant is 'not limited to the precise arguments made below' in support of any claim he properly made there, '[q]uestions not properly raised and preserved during the proceedings under examination, and points not asserted with sufficient precision to indicate distinctly the party's thesis, will normally be spurned on appeal.'"[23] Even if appellant's

---

[22] *Cf. Johnson v. United States*, 960 A.2d 281, 299 n.18 (D.C. 2008) (rejecting murder defendant's claim that trial court erred in excluding testimony about his fearful state of mind that would have been supportive of imperfect self-defense where "appellant never argued to the court that he sought to introduce the evidence as part of any claim for mitigation under an imperfect self defense theory").

[23] *Comford v. United States*, 947 A.2d 1181, 1186 (D.C. 2008) (quoting *Yee v. Escondido*, 503 U.S. 519, 534 (1992), and *Miller v. Avirom*, 384 F.2d 319, 321-22 (D.C. Cir. 1967)).

imperfect self-defense claim has not irrevocably been waived, appellant's failure to preserve it below means the claim is "subject to the strictures of 'plain error' review."[24] The claim does not survive that scrutiny.

Appellant was convicted of murder in the second degree. Murder is a homicide committed with "malice aforethought," or malice for short. A killing is malicious if the perpetrator acts with the specific intent to kill or inflict serious bodily harm, or in conscious disregard of an extreme risk of death or serious bodily

---

[24] *Id.* (quoting *Thomas v. United States*, 914 A.2d 1, 8 (D.C. 2006)). Those "strictures" are demanding:

> Under the established four-part test for plain error, an appellant must demonstrate not merely that there was an error, but also that the error was "clear" or "obvious" – "so egregious and obvious as to make the trial judge and prosecutor derelict in permitting it, despite the defendant's failure to object." In addition, the appellant must demonstrate that the error affected his substantial rights by showing a reasonable probability that it had a prejudicial effect on the outcome of his trial. Lastly, even if the appellant succeeds in those demonstrations, he also must show that the error seriously affected the fairness, integrity or public reputation of the judicial proceeding. Our cases frequently "have phrased the test as 'manifest injustice,' or a showing that the error resulted in a clear miscarriage of justice.'"

*Id.* at 1189-90 (footnotes omitted).

injury, and does so without justification, excuse, or mitigating circumstances.[25]  If there are mitigating circumstances, the finder of fact might decide the killing was not malicious.  But mitigating circumstances are not completely exculpating; they only serve to reduce the degree of the perpetrator's culpability.  "In this jurisdiction, a homicide constitutes voluntary manslaughter where the perpetrator kills with a state of mind which, but for the presence of legally recognized mitigating circumstances, would render the killing murder."[26]

We have recognized that "[m]itigating circumstances sufficient to reduce the homicide from murder to voluntary manslaughter exist when a defendant acted in so-called 'imperfect' self-defense – typically when the defendant honestly believed she needed to use lethal force to protect herself, but the belief was not objectively reasonable or the defendant was responsible for starting or triggering the

---

[25]  *See Comber v. United States*, 584 A.2d 26, 38-41 (D.C. 1990) (en banc).  Malice may be implied when the homicide occurs in the course of the intentional commission of certain felonies.  *Id.* at 39-40.

[26]  *Id.* at 42.  In other words, "killings classified as voluntary manslaughter would in fact be second degree murder but for the existence of circumstances that in some way mitigate malice."  *Id.* (quoting *United States v. Bradford*, 344 A.2d 208, 215 (D.C. 1975).  The requisite *mens rea* for murder and voluntary manslaughter is otherwise identical.

violence."[27] The defendant's good faith belief in the necessity of using deadly force is the essential "mitigating factor on the malice element of murder" that justifies reducing the offense to manslaughter.[28] Consequently, a defendant has not necessarily "forfeited his right to any imperfect self-defense claim because he voluntarily placed himself in a position likely to provoke trouble."[29] However, that is so only up to a point. The mitigation rationale is inapplicable if the defendant had the intention of killing the victim when he went to the fatal encounter, i.e., *before* the perceived need to defend himself from the victim arose. The killing was still with malice aforethought in that case. We thus agree with the conclusion other courts have reached, that "a defendant is not entitled to invoke the doctrine of imperfect self-defense if he or she initiated the confrontation between the victim and himself or herself with the intent to kill or do great bodily harm, even if, at the

---

[27] *Bassil v. United States*, 147 A.3d 303, 307 n.7 (D.C. 2016) (citing *Swann v. United States*, 648 A.2d 928, 930-33 (D.C. 1994) and *Richardson v. United States*, 98 A.3d 178, 187 n.11 (D.C. 2014)). *See also Williams v. United States*, 858 A.2d 984, 993 n.13 (D.C. 2004); Criminal Jury Instructions for the District of Columbia, No. 4.202 (5th Ed. 2018).

[28] *Swann*, 648 A.2d at 933.

[29] *Id.* ("[O]ne of the recognized circumstances in which imperfect self-defense may be asserted is where the defendant plays such a part in bringing on the difficulty.")

time he or she shot the victim, the defendant honestly and reasonably believed that his or her life was in danger."[30]

In the present case, this limiting principle disposes of appellant's argument. It is undisputed that before any mitigating circumstances arose, appellant went down to a basement apartment to retrieve a firearm in order to bring it to a confrontation with Austin. Given that appellant could have avoided the confrontation altogether, his conduct strongly suggests that he had the intention of killing Austin well before Austin gave him any reason to fear for his life and use

---

[30] *Johnson v. Hofbauer*, 159 F. Supp. 2d 582, 604 (E.D. Mich. 2001); *see also People v. Kemp*, 508 N.W.2d 184, 187 (Mich. Ct. App. 1993) ("[I]f one takes life, though in defense of his own life, in a quarrel which he himself has commenced with the intent to take life or inflict grievous bodily harm, the jeopardy in which he has been placed by the act of his antagonist constitutes no defense, whatever, but he is guilty of murder. But if he commenced the quarrel with no intent to take life or inflict grievous bodily harm, then he is not acquitted of all responsibility for the affray which arose from his own act, but his offense is reduced from murder to manslaughter. . . . [A defendant] is not entitled to invoke the doctrine of imperfect self-defense to mitigate his crime to manslaughter if the circumstances surrounding the incident indicate that he initiated the confrontation between himself and the victim with the intent to kill or do great bodily harm." (Internal quotation marks and citations omitted.)); *Wallace v. United States*, 162 U.S. 466, 471 (1896) ("Where a difficulty is intentionally brought on for the purpose of killing the deceased, the fact of imminent danger to the accused constitutes no defence; but where the accused embarks in a quarrel with no felonious intent, or malice, or premeditated purpose of doing bodily harm or killing, and under reasonable belief of imminent danger he inflicts a fatal wound, it is not murder.").

lethal force to defend himself. In presenting his ineffective assistance claim, appellant did nothing to dispel that implication of malice aforethought; he offered no other explanation for his behavior.

In sum, even assuming the evidence would have permitted a jury to find that Austin brandished a knife, and that appellant perceived himself at that moment to be in imminent danger, appellant failed to proffer facts showing that he would have had a meritorious claim of imperfect self-defense. It certainly was far from obvious. Appellant therefore did not make the showing of prejudice required by *Strickland* (and for a finding of plain error), a reasonable probability that, had he received the effective assistance of counsel, a jury instructed on imperfect self-defense would not have found him guilty of murder. Accordingly, we hold that the motion judge did not plainly err by denying his ineffective assistance claim without *sua sponte* entertaining the possibility, a speculative one at best, that appellant might have been able to raise a defense of imperfect self-defense.

For the foregoing reasons, we affirm the denial of appellant's motion for relief from his convictions.