05-4500-cr(L)
USA v. Major (Desinor)

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

August Term 2007

(Argued: October 24, 2007                    Decided: May 8, 2008)

Docket Nos. 05-4500-cr(L), 05-5907-cr(con), 06-2256-cr(con)
----------------------------------------------------------x
UNITED STATES OF AMERICA,

         Appellee,

                         -- v. --

WILNER DESINOR, JASON DENT, DAQUAN MAJOR,

         Defendants-Appellants.

----------------------------------------------------------x

B e f o r e :  WALKER, STRAUB, and HALL, Circuit Judges.

Appeal from judgments of conviction of various narcotics offenses entered in the United States District Court for the Eastern District of New York (David G. Trager, Judge), sentencing defendants to 360 months or more of incarceration. We conclude that defendants were not entitled to a jury charge on self-defense; that there was no error in the jury charge regarding the nexus between the drug conspiracy and the murder of a rival gang member; and that the evidence was sufficient to prove the existence of that nexus beyond a reasonable doubt. However, because the district court imposed a 120-month consecutive sentence on defendant Desinor for discharging a firearm, without making the requisite finding of discharge, that portion of Desinor's sentence must be vacated and remanded.

AFFIRMED IN PART, VACATED AND REMANDED IN PART.

AVRAHAM C. MOSKOWITZ (Joseph A. Grob, on the brief), Moskowitz & Book, New York, N.Y., for Defendant-Appellant Wilner Desinor.

BERNARD H. UDELL, Brooklyn, N.Y., for Defendant-Appellant Jason Dent.

LAURA OPPENHEIM (Richard I. Rosenkranz, on the brief), Brooklyn, N.Y., for Defendant-Appellant Daquan Major.

EMILY BERGER, PETER KATZ, Assistant United States Attorneys, of counsel (Jo Ann M. Navickas, Assistant United States Attorney, of counsel, on the brief), for Roslynn R. Mauskopf, United States Attorney for the Eastern District of New York, Brooklyn, N.Y., for Appellee.

JOHN M. WALKER, JR., Circuit Judge:

Following a jury trial, defendants-appellants Wilner Desinor, Jason Dent, and Daquan Major were convicted of, inter alia: conspiring to distribute and possess with intent to distribute fifty or more grams of crack cocaine, in violation of 21 U.S.C. §§ 846 and 841(b)(1)(A); engaging in a narcotics conspiracy resulting in murder, in violation of 21 U.S.C. § 848(e)(1)(A); engaging in a narcotics conspiracy while engaging in a conspiracy to murder, in violation of 21 U.S.C. §§ 846 and 848(e)(1)(A); and using a firearm in relation to a drug trafficking offense and during a crime of violence, in violation of 18 U.S.C. § 924(c)(1)(A). The District Court for the Eastern

-2-

District of New York (David G. Trager, <u>Judge</u>), sentenced all of the defendants to 360 months of imprisonment or more.

On appeal, defendants challenge their convictions and sentences, arguing that: the district court erred in failing to charge the jury on self-defense; error infected the jury instruction on the nature of the relationship between the drug conspiracy and the murder; the evidence was insufficient to prove the requisite relationship beyond a reasonable doubt; and the district court erred in imposing excessively long sentences. All but one of defendants' arguments lack merit. We conclude that the district court erred in imposing a consecutive sentence of 120 months on Desinor for the discharge of a firearm in relation to a drug trafficking crime, because it made no finding that a discharge had occurred. We therefore vacate that portion of Desinor's sentence and remand to the district court for resentencing.

**BACKGROUND**

Desinor, Dent, and Major were members of a violent gang, known as "the Cream Team,"[1] that sold crack cocaine at the Marlboro housing project in Brooklyn. Led by Dent, the Cream

---

[1] "Cream Team" is an acronym for "cash rules everything around me, together everyone achieves more." <u>See</u> Wu-Tang Clan, <u>C.R.E.A.M.</u>, <u>on</u> Enter the Wu-Tang (36 Chambers) (Loud/RCA Records 1993) ("Cash Rules Everything Around Me, CREAM, Get the money, Dollar, dollar bill y'all . . . ."); <u>see also</u> Wyclef Jean, Sweetest Girl (Dollar Bill) (Columbia Records 2007) ("Cos I'mma tell you like Wu told me, cash rules everything around me . . . .").

-3-

Team sold drugs primarily behind Building 8 of the Marlboro Houses and in a nearby area called "the Stores." A rival drug organization led by Kijuanne Thompson, known as "Yanni," sold crack cocaine in the vicinity of Building 2 of the Marlboro project. The Cream Team frequently used intimidation and violence to protect its territory and obtain drug proceeds. For example, in the summer and fall of 1999, Major threatened to kill a teenager working for Yanni if he continued to sell crack cocaine behind Building 8, Dent stabbed a member of Yanni's organization who "wasn't supposed to be" in Cream Team territory, and Desinor struck a woman for not meeting a payment deadline for crack that she had purchased on credit.

Against this backdrop, according to trial testimony by Cream Team member Jason Jones, on March 24, 2000, Yanni held Dent's brother Joseph in a choke-hold, with a gun to his head, and demanded Dent's whereabouts. Yanni subsequently fired shots at Joseph, but missed him. Joseph immediately reported these events to Dent and other members of his gang. Cream Team member Naequan Clarke testified at trial that he, Dent, and Major grabbed handguns and started toward Building 2 to retaliate but stopped when they noticed a police presence.

The next morning, on March 25, 2000, Dent saw Yanni's cousin, Ramel Flowers, leaving Building 2 and, according to testimony by Cream Team member James Mealey, shot at him because Flowers was aligned with Yanni and had been looking

-4-

"suspiciously" at Dent from the building. Clarke testified that later that evening, after Cream Team members saw Yanni and several others in front of Building 2, Dent told his crew to arm themselves and then to "light up building two" to "support the Cream Team, defend the Cream Team and members of the Cream Team." Major and Clarke retrieved several guns and distributed them to members including themselves, Desinor, Dent, and Jones.

Clarke and Jones entered Building 2. Jones later testified that Dent had ordered them to shoot Yanni or any member of his crew that they saw. Clarke testified only that the plan was to look for Yanni in the lobby and to leave if he was not there. Clarke and Jones decided to begin their search for Yanni at the top floor and to work their way down. Dent and Major stayed outside as bait, while Desinor remained in the nearby bushes as a lookout. As Clarke and Jones descended the stairs from the fourth or fifth floor with their guns drawn, they saw Flowers burst through the door into the stairwell on the third floor. When Flowers reached for what Clarke and Jones thought was a gun, Clarke fired four or five shots until his handgun jammed, but his shots missed Flowers. At that point, Clarke pulled Jones in front of him and told Jones to shoot Flowers. Jones fired once with his shotgun and hit Flowers, who died in the hospital. Clarke later testified that he had first motioned to Flowers to leave but opened fire when he thought he saw Flowers reaching for a gun.

On June 15, 2000, armed with a search warrant, police searched the apartment where the Cream Team kept money, receipts, guns, bullets, and drugs; seized the items kept there; and arrested Dent and other Cream Team affiliates.

At trial, a jury found Dent, Major, and Desinor guilty of conspiring to distribute and possess with intent to distribute fifty or more grams of crack cocaine ("Count One"), in violation of 21 U.S.C. §§ 846 and 841(b)(1)(A); engaging in a narcotics conspiracy resulting in murder ("Count Two"), in violation of 21 U.S.C. § 848(e)(1)(A); engaging in a narcotics conspiracy while engaging in a conspiracy to murder ("Count Three"), in violation of 21 U.S.C. §§ 846 and 848(e)(1)(A); and using a firearm in relation to a drug trafficking offense and during a crime of violence ("Count Four"), in violation of 18 U.S.C. § 924(c)(1)(A). Dent and Major were also convicted of unlawful use of a firearm causing death ("Count Five"), in violation of 18 U.S.C. § 924(j)(1), and Major was convicted of being a felon in possession of a firearm ("Count Six"), in violation of 18 U.S.C. § 922(g)(1). Pursuant to Pinkerton v. United States, 328 U.S. 640 (1946), defendants' convictions on Counts Two, Four, and Five were predicated on the liability of their co-conspirators, Clarke and Jones, for the murder of Flowers. See App. at 339-40 (instructing the jury that "the reasonably foreseeable acts . . . of any member of the conspiracy in furtherance of the common purpose of the conspiracy are deemed, under the law, to be the

acts of all of the members, and all of the members are responsible for such acts").

The district court sentenced Desinor to three concurrent terms of 240 months' imprisonment on Counts One, Two, and Three, and a consecutive 120-month prison term on Count Four; Dent to four concurrent terms of 360 months' imprisonment on Counts One, Two, Three, and Five, and a consecutive 120-month prison term on Count Four; and Major to four concurrent terms of 276 months' imprisonment on Counts One, Two, Three, and Five, one concurrent term of 120 months on Count Six, and a consecutive term of 120 months on Count Four. This appeal followed.

## DISCUSSION

Defendants challenge their convictions on Count Two (engaging in a narcotics conspiracy resulting in murder) on the ground that the district court erred in refusing to instruct the jury on self-defense. Major also contends that the district court erred in its jury charge regarding 21 U.S.C. § 848(e)(1)(A)'s requirement that the Flowers murder be related to the drug conspiracy. Defendants further argue that the evidence was insufficient to prove this element of § 848(e)(1)(A) beyond a reasonable doubt. Finally, Desinor challenges his ten-year consecutive sentence for discharging a firearm on the ground that the district court failed to make a finding that any discharge occurred.

**I.   Jury Charge on Self-Defense**

Defendants first argue that because Clarke and Jones – the two men directly responsible for the murder of Ramel Flowers – arguably shot Flowers in self-defense, a properly charged jury could have found that there was no "murder" or "intentional killing" to provide the basis for defendants' convictions on Count Two (engaging in a narcotics conspiracy resulting in murder).  In other words, because defendants' convictions on Count Two were based on the Pinkerton theory of co-conspirator liability, a successful self-defense claim as to Clarke and Jones would have eliminated the predicate murder upon which Pinkerton liability for all defendants under Count Two was based. Defendants contend that the district court erred in failing to instruct the jury on the availability to Clarke and Jones of this defense, as defendants had requested.

We review a district court's refusal to issue requested jury instructions de novo. United States v. Gonzalez, 407 F.3d 118, 122 (2d Cir. 2005).  A conviction will not be reversed on this basis unless the requested instruction was legally correct, "represent[ed] a theory of defense with [a] basis in the record that would lead to acquittal," United States v. Bok, 156 F.3d 157, 163 (2d Cir. 1998) (internal quotation marks and citation omitted), and the charge actually given was prejudicial, Gonzalez, 407 F.3d at 122.

In support of their claim that Clarke and Jones killed Flowers in self-defense, defendants point to Clarke and Jones's

testimony that they shot Flowers because they thought he was reaching for a gun and were afraid that he was going to shoot them. As Clarke put it, "I reacted because I didn't want to be shot." In response, the government argues that Clarke and Jones have no right to self-defense because they were the initial aggressors in the conflict, and it is the law in this circuit that "an aggressor in a conflict resulting in death may not claim self-defense." Deluca v. Lord, 77 F.3d 578, 586 (2d Cir. 1996).

As the defense asserted at trial, there was at least minimal evidence that, even if they were the initial aggressors, Clarke and Jones withdrew and attempted to communicate their withdrawal from the conflict with Flowers before Flowers reached for his gun. Clarke testified on direct examination that when Flowers burst into the third floor stairwell, "I put my hand up to my lips. Tell him to be quiet. . . . I told him – I push him away, like, go ahead. But he stood there. Started reaching for a gun." On cross-examination, Clarke testified that he "motioned to [Flowers] to leave so he would get out of the area" because he was "going to let him go," at which point Flowers "started to reach for a gun." Clarke further testified that he "motioned for [Flowers] to shut up and be quiet. . . . to tell him, go ahead, and mind his business. . . . I push him away," and he claimed that he had no intention of shooting Flowers at that time because "the plan was just to shoot Yanni."

The government counters that the record does not adequately

-9-

demonstrate that Clarke and Jones withdrew and communicated this withdrawal to Flowers because Clarke's hand gesture to Flowers was ambiguous and was made while Clarke was still holding his gun. See Appellee's Br. at 59 (arguing that Clarke's gesture alone "did not necessarily convey to Flowers that his life had been spared," and that "there were signs to the contrary" as well).

We stated in United States v. Thomas that "[i]t has long been accepted that one cannot support a claim of self-defense by a self-generated necessity to kill. The right of homicidal self-defense is . . . denied to slayers who incite the fatal attack . . . ." 34 F.3d 44, 48 (2d Cir. 1994) (omissions in original) (internal quotation marks and citation omitted); cf. N.Y. Penal Law § 35.15(1)(b) (providing that the justification of self-defense is not available to an initial aggressor). "Only in the event that he communicates to his adversary his intent to withdraw and in good faith attempts to do so is he restored to his right of self-defense." United States v. Taylor, 510 F.2d 1283, 1287 (D.C. Cir. 1975) (internal quotation marks and citation omitted); cf. N.Y. Penal Law § 35.15(1)(b) (providing an exception whereby an initial aggressor may claim self-defense "if the actor has withdrawn from the encounter and effectively communicated such withdrawal to such other person but the latter persists in continuing the incident").

In this case, it is undisputable that Clarke and Jones were

-10-

the initial aggressors when they entered Building 2 armed, respectively, with a handgun and a shotgun, for the purpose of killing Yanni and possibly other members of his crew. Defendants argue, however, that the two men shot Flowers in self-defense after they indicated their desire that he leave and after he drew a weapon on them.

We need not decide whether, to warrant a self-defense jury charge, there was enough evidence that Clarke and Jones withdrew from the encounter with Flowers and adequately communicated that withdrawal to him. This is because, in the context of this case, for a self-defense justification to be available, (1) the shooters had to have withdrawn from the confrontation with Flowers and communicated that fact, and (2) the dangerous situation they had created by setting out to kill Yanni or his affiliates had to have dissipated. Even if the evidence unequivocally demonstrated that Clarke and Jones had done the first of the two, they failed to show that at the time the violent encounter with Flowers occurred, the dangerous situation that they had created by entering Building 2 armed and with the purpose of killing Yanni or his associates had ended.

Because the law pertaining to self-defense is a matter of federal common law, see United States v. Butler, 485 F.3d 569, 572 n.1 (10th Cir. 2007) (noting that the justification defense has been developed "by drawing on common law"), we find it appropriate to look to state court decisions for guidance on the

novel question we now address, see Wallace v. United States, 162 U.S. 466, 471-73 (1896) (drawing on, inter alia, state court decisions in fashioning federal self-defense doctrine); Thomas, 34 F.3d at 48 (citing state statutory and case law on self-defense).  Those decisions suggest that a defendant who initiates a violent crime, such as an armed robbery, that results in a fatal shooting may not claim self-defense absent a showing that, at the time the shooting occurred, the dangerous situation created by the initial crime had dissipated.  See, e.g., Gray v. State, 463 P.2d 897, 909-10 (Alaska 1970) (holding that the defendant, an armed robber, had forfeited his right to claim self-defense because "the perilous situation created by the armed robbery continued to exist at the time the shooting occurred," and that "[w]here, as in this case, the defendant commits a felony which includes an immediate threat of violence, he has created a situation so fraught with peril as to preclude his claim of self-defense to any act of violence arising therefrom").  The loss of this right holds even if the defendant, in good faith, withdraws from the immediate confrontation and communicates that withdrawal.  See, e.g., State v. Owen, 253 P.2d 203, 214-16 (Idaho 1953), overruled in part on other grounds by State v. Shepherd, 486 P.2d 82 (Idaho 1971).  As long as the defendant remains engaged in the perpetration or attempted perpetration of the crime that he initiated, "he cannot be excused for taking the life of his antagonist to save his own.

In such a case it may be rightfully and truthfully said that he brought the necessity upon himself by his own criminal conduct." Id. at 216 (internal quotation marks and citation omitted).

As evidence that the dangerous situation created by a defendant's initial crime persisted, courts in armed robbery cases have cited the fact that the defendant was still inside the robbed premises at the time of the shooting and that his gun was always in his hand, prepared to shoot. See, e.g., Gray, 463 P.2d at 910 (concluding, based in part on these facts, that the defendants were still engaged in the armed robbery at the time of the shooting); State v. Diggs, 592 A.2d 949, 952 (Conn. 1991) ("As long as a person keeps his gun in his hand prepared to shoot, the person opposing him is not expected or required to accept any act or statement as indicative of an intent to discontinue the assault." (internal quotation marks and citation omitted)); Owen, 253 P.2d at 215 ("The deceased was not required to accept [the defendant's] command to 'stand still and let me out of here,' as conclusive of his intention to abandon the hold-up. He was still being menaced by the flaming gun in [the defendant's] hand . . . ."); see also State v. Shockley, 80 P. 865, 869 (Utah 1905) ("[S]o long as [the defendant] kept his gun in his hand prepared to shoot, [the victims] were neither expected nor required to construe and accept any act or statement of his as an intent on his part to discontinue the assault and surrender himself as a prisoner.").

From this body of law, we conclude in this case that before defendants could obtain a jury instruction on self-defense, they must offer evidence from which a jury could find not only that Clarke and Jones had demonstrably withdrawn from the immediate confrontation with Flowers, but also that the dangerous situation created by their initial undertaking to kill Yanni no longer existed. Defendants have not met that burden. There is no doubt that Clarke and Jones entered Building 2, armed with loaded guns, for the purpose of killing Yanni and possibly other members of his crew. It makes no difference whether, as Clarke testified, "the plan was just to shoot Yanni," or, as Jones claimed, Dent had ordered them to shoot Yanni <u>or</u> any member of his crew that they encountered. When they encountered Flowers in the stairwell, they had already created a dangerous situation, by virtue of their active participation in a conspiracy to commit murder. <u>Cf.</u> <u>Owen</u>, 253 P.2d at 216 ("[W]hen these men entered the store, both armed with loaded guns, for the avowed purpose of robbery, they bargained for violence."). And because the risk of just such an encounter was precisely what made their conduct so dangerous, the shooting was "an[] act of violence arising therefrom." <u>Gray</u>, 463 P.2d at 910.

There was no evidence whatsoever that at the time Clarke and Jones shot Flowers, the dangerous situation had abated or that Clarke and Jones had lowered their guns. Indeed, Clarke testified that at the time he gestured to Flowers, he still

-14-

"ha[d] [his] gun out." Plainly the danger from the conspiracy to kill Yanni or his crew still loomed at the time of Flowers's murder. Under these circumstances, the right of self-defense was not available to Clarke and Jones, and no such right could therefore be claimed by defendants. The district court did not err in denying the requested jury charge.

**II. Jury Charge with Respect to § 848(e)(1)(A)'s "Engaging In" Element**

Section 848(e)(1)(A) of Title 21, pursuant to which defendants were convicted on Counts Two and Three, sets forth the penalties for "any person engaging in or working in furtherance of . . . [a drug] offense punishable under section 841(b)(1)(A) . . . who intentionally kills or counsels, commands, induces, procures, or causes the intentional killing of an individual." In charging the jury on the "engaging in" element of this statute, the district court stated that

> the government must establish that a particular defendant intentionally killed Ramel Flowers while engaging in a conspiracy to distribute or possess with the intent to distribute fifty or more grams of cocaine base. The term "while engaged in" . . . requires not only that the crime occur during the time period covered by the drug conspiracy, but also that the killing be related in some meaningful way to the drug conspiracy. Moreover, each individual defendant's participation in the killing must be related to the drug conspiracy.
>
> You may find that the killing was related to the drug conspiracy if you find that there was a connection between the individual defendant's role in the killing and his participation in the drug conspiracy. For example, a defendant engaging in a narcotics conspiracy who kills a spouse in a purely non-drug-related domestic dispute would not satisfy this element of Count Two.

-15-

The government must prove that <u>at least one of the defendant's purposes</u> or motives in the killing of Ramel Flowers was because of the narcotics conspiracy charged in Count One. It is not necessary for the government to prove that this motive was the sole purpose, <u>or even the primary purpose</u>, of a defendant to commit the charged crime. You need only find that it was one of his purposes or motives.

App. at 358-59 (emphasis added).

Major argues that the district court did not adequately instruct the jury on the law. He contends that the district court's instruction impermissibly minimized the requirement of a meaningful relationship between the Flowers murder and the narcotics conspiracy charged in Count One. Instead, he argues, the jury should have been told that the necessary relationship was more substantial, and that furthering the narcotics conspiracy must have been more than just one of many potential purposes in killing Flowers. Along these lines, defendants requested the following instruction:

If you find that a number of motives led to the killing of Ramel Flowers you must be unanimously persuaded beyond a reasonable doubt that a motive meaningfully related to the . . . narcotics conspiracy was <u>at least as important</u> as any other influencing factor before you can convict the defendant. Thus, if you find that a factor unrelated to the specified narcotics conspiracy was more significant to the murder of Ramel Flowers, you must acquit the defendant even if you find that there was a secondary, less significant factor relating to the specified narcotics conspiracy that may also have influenced the murder.

App. at 62-63 (emphasis added).

We review jury instructions de novo, "reversing only where a charge either failed to inform the jury adequately of the law or misled the jury about the correct legal rule." <u>United States v.</u>

-16-

Ganim, 510 F.3d 134, 142 (2d Cir. 2007) (internal quotation marks and citation omitted), petition for cert. filed, 76 U.S.L.W. 3512 (U.S. Mar. 7, 2008) (No. 07-1162). "Where, as here, a defendant requested a different jury instruction from the one actually given, the defendant bears the burden of showing that the requested instruction accurately represented the law in every respect," United States v. Nektalov, 461 F.3d 309, 313-14 (2d Cir. 2006) (internal quotation marks and citation omitted), and that "viewing the charge as a whole, there was a prejudicial error," United States v. Brand, 467 F.3d 179, 205 (2d Cir. 2006) (internal quotation marks and citation omitted), cert. denied, 127 S. Ct. 2150 (2007). We reject Major's argument. The district court's instruction on the "engaging in" element was neither erroneous nor prejudicial, and it would have been improper to have given the defense's requested charge.

We have had no previous occasion to construe the "engaging in" element of 21 U.S.C. § 848(e)(1)(A) in a way that answers defendants' argument. The district court in United States v. Walker, 912 F. Supp. 646, 653 (N.D.N.Y. 1996), aff'd 142 F.3d 103 (2d Cir. 1998), stated that § 848(e)(1)(A) required the government to "prove that the killing was related in some meaningful way to the [narcotics conspiracy] and the Court will charge the jury that it must so find." In response to the defendant's sufficiency challenge, the district court found it sufficient, "[o]n the record before it," that "a rational jury

-17-

could conclude on at least one basis that the intentional killing alleged here was committed in furtherance of the alleged [narcotics conspiracy], (i.e. that the killing was undertaken to secure drugs and money to be used in furtherance of the alleged [narcotics conspiracy]." Id. (emphasis added).

On appeal, we affirmed the conviction, concluding that on the facts presented, "a rational jury could have found that the purpose of the murder was to obtain drugs and money to be used in furtherance of the [drug conspiracy]." Walker, 142 F.3d at 112-13. Although we remarked in Walker that a jury could find that the purpose of the murder was drug-related (as opposed to one purpose), we did not comment on whether a jury was required to find that the sole or primary purpose of the murder was drug-related. We now agree with the reasoning of the district court in Walker and hold that no such requirement is necessary.

To convict a defendant of engaging in a narcotics conspiracy resulting in murder (or engaging in a narcotics conspiracy while engaging in a conspiracy to murder) under 21 U.S.C. § 848(e)(1)(A), the government need only prove beyond a reasonable doubt that one motive for the killing (or conspiracy to kill) was related to the drug conspiracy. The existence of other motives does not affect the government's ability to satisfy the "engaging in" element, as long as there is a substantive connection between the defendant's role in the murder (or murder conspiracy) and his participation in the drug conspiracy. Cf. United States v.

-18-

Jones, 101 F.3d 1263, 1267 (8th Cir. 1996) (construing §
848(e)(1)(A) as requiring the jury to find "a substantive
connection between the killing and the [narcotics conspiracy]"
(emphasis added)).  The government has no burden to establish
that a drug-related motive was the sole purpose, the primary
purpose, or even that it was equally as important as any non-
drug-related purpose, as long as it was one purpose.

Applying this principle to the instant case, we hold that
the district court correctly rejected defendants' request and
properly instructed the jury on the necessary relationship
between the murder of Flowers and the drug conspiracy charged in
Count One.

**III. Sufficiency of Evidence with Respect to § 848(e)(1)(A)'s "Engaging In" Element**

Defendants also challenge the sufficiency of the evidence
with regard to Counts Two and Three (engaging in a narcotics
conspiracy resulting in murder, and engaging in a narcotics
conspiracy while engaging in a conspiracy to murder,
respectively).  They argue that the government failed to prove
beyond a reasonable doubt that the Flowers murder and the
conspiracy to murder Yanni were drug-related; rather, they claim,
the evidence shows that those crimes stemmed from a personal feud
between Dent and Yanni.

Defendants raising a sufficiency challenge bear "a heavy
burden." United States v. Jackson, 335 F.3d 170, 180 (2d Cir.
2003) (internal quotation marks and citation omitted).  On

-19-

appeal, we must "view the evidence presented in the light most favorable to the government, and . . . draw all reasonable inferences in its favor," affirming the jury verdict "unless no rational trier of fact could have found all of the elements of the crime beyond a reasonable doubt." United States v. Giovanelli, 464 F.3d 346, 349 (2d Cir. 2006) (per curiam) (omission in original) (internal quotation marks and citations omitted), cert. denied, 128 S. Ct. 206 (2007). Furthermore, it is the province of the jury to resolve conflicting testimony, and we must defer to the jury's assessment of witness credibility. United States v. Bala, 236 F.3d 87, 93-94 (2d Cir. 2000).

Based on the evidence presented, and in light of our holding in Part II, supra, a rational juror could have found that at least one reason for both Flowers's murder and the conspiracy to murder Yanni or his crew was related to the drug distribution conspiracy. Defendants emphasize testimony by Clarke and Jones "that the Flowers homicide and the murder conspiracy were the culmination of a personal 'beef' [i.e., feud] between Jason Dent and Yanni," arising out of an altercation at a 1999 New Year's party, "and had nothing to do with a dispute over drugs." Appellant Desinor's Br. at 37. This "beef," they claim, escalated after Yanni choked and later shot at Dent's brother, Joseph, on March 24, 2000; the events of March 25, 2000 therefore arose out of a desire (primarily on the part of Jason Dent) to retaliate against Yanni for shooting at Joseph. Defendants

-20-

argue, based on this testimony and on separate testimony by Clarke, that no drug war existed at the time of Flowers's murder, and that therefore no rational juror could have found the requisite drug-related motive. We disagree.

There is ample evidence in the record for the jury to have found that the March 25, 2000 plan to attack Yanni and his crew and the resulting murder of Flowers were related to the ongoing drug rivalry between the Cream Team and Yanni's crew and to the defendants' desire to dominate their rivals in the drug trade. For example, Jones testified that the March 25 attack was "a crew thing," and Clarke testified that one of the purposes of going to Building 2 that night was "to support the Cream Team, defend the Cream Team and members of the Cream Team." Combining such testimony with abundant evidence of the history of violent disputes over drug territory between the Cream Team and Yanni, the jury easily could have inferred that Flowers was simply another casualty of this rivalry, and that whether or not there was also a personal vendetta against Yanni, there was an underlying motive to protect the Cream Team's narcotics business from Yanni's interference. See Walker, 142 F.3d at 112. We therefore reject defendants' sufficiency challenge.

**IV.  Desinor's 120-Month Consecutive Sentence**

Following Desinor's conviction on Count Four for use of a firearm in relation to a drug trafficking offense and during a crime of violence, in violation of 18 U.S.C. § 924(c)(1)(A), the

-21-

district court sentenced him on that count to a consecutive term of 120 months' imprisonment.  The sentence was based on § 924(c)(1)(A)(iii), which requires a minimum prison sentence of 120 months if the firearm is discharged.  Desinor challenges the sentence on the ground that the district court failed to make any finding as to whether he had actually discharged a weapon, as opposed to simply carrying it, see 18 U.S.C. § 924(c)(1)(A)(i) (providing a mandatory minimum of five years' imprisonment), or brandishing it, see id. § 924(c)(1)(A)(ii) (seven years).

We review a district court's sentencing determination for reasonableness, United States v. Booker, 543 U.S. 220, 260-62 (2005), which involves "consideration not only of the sentence itself, but also of the procedures employed in arriving at the sentence," United States v. Fernandez, 443 F.3d 19, 26 (2d Cir.), cert. denied, 127 S. Ct. 192 (2006).  The standard of review is abuse of discretion.  Gall v. United States, 128 S. Ct. 586, 591 (2007); United States v. Villafuerte, 502 F.3d 204, 206 (2d Cir. 2007).

There is no doubt that the district court imposed the ten-year statutory minimum sentence because it believed that the jury had concluded that Desinor had discharged his firearm.  See App. at 529-32.  There was no basis for this belief, however, because the district court's charge to the jury stated that, to convict defendants on Count Four,

> [t]he government does not . . . need to show that the defendant fired or even attempted to fire the firearm.  It

-22-

> is enough for the government to show that he brandished or displayed the weapon or otherwise made reference to it in a manner calculated to further the commission of the crime charged in Count One.

Id. at 362-63 (emphasis added). Thus, the jury's verdict on Count Four did not determine that Desinor discharged a weapon, and the district court never made its own independent finding to that effect. Cf. Harris v. United States, 536 U.S. 545, 556 (2002) (holding that 18 U.S.C. § 924(c)(1)(A) "regards brandishing and discharging as sentencing factors to be found by the judge, not offense elements to be found by the jury").

Because, under these circumstances, the district court abused its discretion in sentencing Desinor on Count Four, we vacate that portion of the sentence and remand for further fact-finding and for resentencing in accordance with this opinion.

**V.    Defendants' Remaining Arguments**

We have fully considered defendants' remaining arguments: Desinor's contention that his conviction on Count One for conspiracy to distribute and possess with intent to distribute fifty or more grams of crack cocaine cannot stand because the evidence did not establish his involvement in the drug conspiracy; Dent's claim that his conviction on Count One cannot stand because the evidence was insufficient to show (1) that he was the leader of the Cream Team, and (2) that there was a single narcotics conspiracy as opposed to a collection of independent transactions; Dent's arguments that the evidence was insufficient to prove that he intended Flowers's death, thereby invalidating

-23-

his conviction on Count Two, and that the district court failed to properly instruct the jury as to this specific intent requirement; Major's argument that he was prejudiced by the admission of certain expert testimony; and Dent's challenge to his forty-year sentence as excessive. We find all of these arguments to be without merit.

**CONCLUSION**

For the foregoing reasons, the judgments of the district court as to Dent and Major are AFFIRMED. The judgment as to Desinor is AFFIRMED in part and VACATED in part, and the case is REMANDED for further proceedings consistent with this opinion.