**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**May 12, 2025**

**Christopher M. Wolpert**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

_____

UNITED STATES OF AMERICA,

    Plaintiff - Appellee,

v.

STETSON SHANE BARNES,

    Defendant - Appellant.

No. 22-2147
(D.C. No. 5:20-CR-01486-KG-1)
(D. N.M.)

_____

**ORDER AND JUDGMENT**[*]
_____

Before **HOLMES**, Chief Judge, **McHUGH**, and **EID**, Circuit Judges.
_____

Stetson Barnes, along with three co-conspirators, helped steal a motorcycle and killed its owner in the process. Barnes was subsequently convicted of three charges arising out of the incident, including carjacking resulting in death.

Barnes now challenges his conviction, raising two primary arguments on appeal. First, he argues that he did not "take" the motorcycle, as required for a carjacking under 18 U.S.C. § 2119, because he mistakenly thought it belonged to his co-conspirator, not the victim. Because the district court interpreted § 2119 otherwise, Barnes claims, it erroneously denied his motion to sever, erroneously

---

[*] This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. It may be cited, however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

granted the government's motion in limine to exclude evidence of Barnes's mistaken belief, and erroneously instructed the jury. Second, Barnes argues that the district court abused its discretion by refusing to give Barnes's requested self-defense jury instruction.

We affirm the district court on both issues. As to the first, we reject Barnes's interpretation of § 2119, holding that a defendant's good-faith claim of right is not a defense to carjacking, so Barnes's mistaken belief as to who owned the motorcycle is irrelevant. As to the second, we conclude that the district court did not abuse its discretion by refusing to give Barnes's requested self-defense jury instruction because Barnes, as the initial aggressor, did not withdraw from the confrontation.

## I.

In May 2019, a man named Donald Busch and his girlfriend, Tristyn Carlo, broke up. Much to Busch's consternation, Carlo then quickly began dating one of Busch's friends, Justin Swenson. Eventually, Busch decided to show Carlo and Swenson his displeasure: shortly after midnight on May 18, 2019, Busch drove to Swenson's home. When he arrived, he saw Carlo's car there—confirming to him that Carlo was with Swenson. As Busch walked onto Swenson's porch, he noticed Swenson's collection of motorcycles and cars stored in an adjacent carport. But Busch did not do anything to the vehicles at the time. Instead, he drove off, heading down the road to meet some friends.

Busch then arrived at a trailer where Stetson Barnes lived, along with their mutual friend, Tyson Terrell. When Busch arrived, Barnes and Terrell were sitting

inside with Terrell's girlfriend, Jehra Hedgecock. Busch asked the group to help him get a dirt bike from Swenson's home. Specifically, Busch proposed that the four of them go over to Swenson's house and "jack" a motorcycle, telling the others that he wanted to "punk"—or intimidate—Swenson. R. Vol. III at 1248, 1368. The group agreed to go along.

As the group drove toward Swenson's house in Hedgecock's truck, Barnes commented that he wanted to "talk shit" to Swenson when they arrived. *Id.* at 1249–51. Additionally, Barnes, Busch, and Hedgecock were all armed with handguns at the time (although the former two were convicted felons who could not lawfully possess firearms). The group arrived at Swenson's house shortly before 1:00 A.M. and parked near the front door. Hedgecock knocked on the door, but no one answered. As Hedgecock walked back to the truck, the other three got out. Barnes stood by the truck's tailgate, anticipating that Busch might need help loading the motorcycle; meanwhile, Busch and Terrell walked over to Swenson's carport and began looking at Swenson's motorcycles.

Busch selected a motorcycle to steal, walked it out of the carport, and began trying to start it. Just then, Swenson opened the front door, holding a pistol pointed toward the ground. Busch told Swenson to go back in the house, and he promptly did so. Once back inside, Swenson called his father and said that he was being robbed.

As Swenson retreated, Busch continued to try to start the motorcycle. But Busch was unable to do so, so he instead began pushing it down the driveway, away from Swenson's home. Meanwhile, the other three got back into Hedgecock's pickup

3

and started to leave. Just at that moment, shots rang out. The parties dispute who shot first: Barnes—sitting in the back passenger seat of the truck—fired shots out the window, toward Swenson's house, while Swenson fired shots toward the truck.

The entire exchange took mere seconds, and at the end of it, Swenson lay dead on the floor inside his home, shot in the head by Barnes's final bullet. After the gunfire, Hedgecock began driving down the road away from the scene but stopped when she realized Busch was not in the car. She doubled back, and the group picked up Busch, loaded the carjacked motorcycle into the bed of the truck, and headed off toward Barnes and Terrell's home.

As they were driving back, Hedgecock received a call from a distraught Carlo, who asked why they had killed Swenson. Everyone in the car heard Carlo, but none of them called 911 or sought medical attention for Swenson. Later on, though, Hedgecock contacted the police, offered to provide information about the incident, and identified Barnes, Busch, and Terrell as her co-conspirators.

A federal grand jury indicted all four co-conspirators, charging them with several counts arising out of the incident. As relevant here, Barnes in particular was charged with (1) conspiracy to commit carjacking in violation of 18 U.S.C. §§ 371 and 2119 (Count 1); (2) carjacking resulting in death in violation of 18 U.S.C. § 2119(3) (Count 2); (3) discharging a firearm resulting in death during a crime of violence in violation of 18 U.S.C. § 924(j) (Count 5); and (4) being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g) (Count 6).

4

Before trial, Barnes moved to sever his case from that of his co-defendants, arguing that their defenses at trial would necessarily conflict. Specifically, Barnes's defense was that he mistakenly believed the stolen motorcycle belonged to Busch, not Swenson—a defense that Barnes claimed would be at odds with Busch's. The district court denied Barnes's motion, and Barnes's case proceeded to a joint trial with Busch and Terrell.

Along similar lines, the district court also granted the government's motion in limine to exclude evidence of Barnes's mistaken belief as to who owned the motorcycle. Just before trial, however, the district court reconsidered its evidentiary ruling, holding instead that Barnes could present evidence pertaining to "the intent element [of carjacking] as it is shaped by the defendants' subjective belie[f] regarding possession and ownership of the motorcycle and what they thought they were doing when they went to [Swenson's] house." R. Vol. III at 592. Notably, the district court stated that evidence of Barnes's subjective belief as to ownership was "relevant and material" only insofar as it related to an intent to cause great bodily injury or death during the commission of the carjacking (as opposed to any other intent component). *Id.* at 591–92.

Finally, before trial, Barnes submitted a proposed jury instruction setting forth the theory of his defense. As relevant here, Barnes's proposed instruction stated that, under his theory, (1) Barnes "did not knowingly and intentionally" commit carjacking or conspire to do so "because he did not know that the other participants were taking

5

a motor vehicle without permission" and (2) Barnes was acting in self-defense when he shot Swenson because Swenson had shot at him first. R. Vol. I at 356.

The district court ultimately gave an instruction that identically tracked Barnes's requested instruction in all material respects. R. Vol. III at 1631–32. But with respect to Barnes's mistaken belief as to ownership, the district court also separately instructed the jury that, "for purposes of Count[s] 1 and 2, taking a motorcycle from the presence of another person does not require a theft or stealing," and so the jury "need not determine ownership of the motorcycle." *Id.* at 1622. Moreover, as to Barnes's proposed self-defense instruction, the district court also gave a separate self-defense instruction that applied only to Count 5 (discharging a firearm resulting in death during a crime of violence), and it expressly declined to give the instruction as to Count 2 (carjacking resulting in death).

At trial, and as allowed by the district court's reconsideration of its evidentiary ruling, Barnes testified that he believed that the motorcycle belonged to Busch, not Swenson, and that he thought Busch had permission to retrieve the motorcycle from Swenson's home. Barnes also presented this defense to the jury during his closing argument.

Barnes was ultimately convicted of Counts 1 and 2 (the carjacking-specific charges) and Count 6 (the felon-in-possession charge). But the jury could not reach a verdict as to Count 5, and that count was dismissed. The district court sentenced Barnes to 480 months' imprisonment to be followed by five years of supervised release. Barnes timely appealed.

6

**II.**

Barnes first asks us to vacate his convictions under Counts 1 and 2—the two carjacking-specific charges—because the district court misinterpreted the "taking" element of 18 U.S.C. § 2119, the federal carjacking statute.  According to Barnes, a defendant cannot "take" a vehicle within the meaning of § 2119 if the defendant has an honest but mistaken belief as to who owns the vehicle.  But the district court interpreted the statute differently, holding instead that Barnes's subjective belief as to the vehicle's owner was irrelevant to his criminal liability.

Barnes contends that the district court's interpretation caused three separate but related errors, each of which he argues independently warrant reversal: specifically, Barnes claims that the district court's interpretation caused it to erroneously (1) deny Barnes's motion to sever; (2) exclude evidence of Barnes's subjective, mistaken belief of ownership; and (3) instruct the jury that ownership of the motorcycle was irrelevant.

We review the district court's interpretation of § 2119 de novo.  *See United States v. Nacchio*, 573 F.3d 1062, 1087 (10th Cir. 2009).  Under § 2119, a defendant is guilty of carjacking if they (1) "take[] a motor vehicle . . . from the person or presence of another" (2) "by force and violence or by intimidation" (3) "with the intent to cause death or serious bodily harm," and (4) the motor vehicle was "transported, shipped, or received in interstate or foreign commerce."  18 U.S.C. § 2119.  This appeal centers on the first of these requirements—the "taking" element.  Barnes claims that, when he helped Busch steal Swenson's motorcycle, he thought

the motorcycle belonged to Busch—and so he believed he was just helping Busch take back his own property. As such, Barnes argues, he could not "take" the motorcycle "from the person or presence of another."

**A.**

In support of his interpretation, Barnes first points to the common-law definition of robbery—a crime closely related to carjacking. *See United States v. Lowell*, 2 F.4th 1291, 1298 (10th Cir. 2021) (noting that "[c]arjacking is a species of robbery" and holding that a "robbery" under 18 U.S.C. § 1111 "encompasses carjacking"); *see also Jones v. United States*, 526 U.S. 227, 235 (1999); *Holloway v. United States*, 526 U.S. 1, 8 (1999) ("The carjacking statute essentially is aimed at providing a federal penalty for a particular type of robbery.").

At common law, robbery was just an aggravated form of theft or larceny. *See* 2 Joel Prentiss Bishop, *Commentaries on the Criminal Law* § 966 (2d ed. 1858) (defining robbery as "larceny committed by violence"). Larceny is "the felonious taking, and carrying away, of the personal goods of another." 5 St. George Tucker, *Blackstone's Commentaries* 229 (Dennis & Co. Inc. 1965) (1803). And robbery, in turn, is the "felonious and forcible taking, from the person of another, of goods . . . by violence or putting him in fear." *Id.* at 241.

Both robbery and larceny thus require that the taking be "felonious," meaning that it must be "done *animo furandi*," or with the intent to steal. *Id.* at 232. Relatedly, it was understood at common law that a "taking" itself—in the context of both robbery and larceny—generally "implies the consent of the owner to be

8

wanting." *Id.* at 230. Thus, for an act to constitute a "taking," "the thing stolen must be *another's*." Bishop, *supra*, § 697 (emphasis in original). And the trespassory nature of a taking "is essential" to both larceny and robbery. 4 William Blackstone, *Commentaries on the Laws of England* 229–30 n.2 (1st ed. 1765); Wayne R. LaFave, 3 *Substantive Criminal Law* § 20.3(a)(1) (3d ed. 2024).[1]

Still, as one common-law treatise notes, early English judges were "divided on the question, whether a man may be guilty of larceny of his own goods." Bishop, *supra*, § 698. But "[o]n principle," the treatise explains, larceny could occur so long as the person from whom the property is taken "sustains to the owner such a relation as to be legally chargeable with the loss of the goods, or at least to have a right of action in his own name against a third person for a trespass upon them." *Id.*; *see* Blackstone, *supra*, at 231. Consistent with that principle, common-law courts generally permitted a "claim-of-right" defense to robbery and larceny, under which a defendant's "honest, though mistaken, claim of ownership of, or claim of a lawful right to possess, the property" constituted an affirmative defense. LaFave, *supra*, § 20.3(b); *see* 77 C.J.S. *Robbery* § 11 (2024) ("A taking of property under a bona fide claim of right or title thereto ordinarily does not constitute robbery.").

---

[1] Indeed, the trespass requirement distinguishes larceny and robbery from common-law embezzlement, which is the fraudulent conversion of property by a person in lawful possession of the property (such as a bailee) with the intent to deprive the owner (or bailor) of possession. *See* Bishop, *supra*, §§ 280–285, 302.

**B.**

Barnes claims that the trespassory component of a "taking" for common-law robbery and larceny, and the concomitant claim-of-right defense, are equally applicable to carjacking under § 2119. Focusing on the statute's structure and legislative history—and emphasizing the interpretive canon of imputed common-law meaning—Barnes argues that § 2119 codifies the common-law understanding of a "taking" and a claim-of-right defense.

The plain text of § 2119 provides no support for Barnes's view. The statute contains no express intent-to-steal element, nor does it expressly require that the "taking" be trespassory or felonious. To Barnes, this "statutory silence" should "end the matter" because it demonstrates that Congress intended to incorporate principles of common-law robbery into § 2119, especially when considering that the statute is contained within the statutory chapter dealing with robbery and burglary. Aplt. Br. at 18–19. But we are not so convinced.

It is true, as explained, that carjacking under § 2119 encompasses a form of robbery. *See Lowell*, 2 F.4th at 1298. But just because carjacking is "*similar* to the common-law crimes of robbery and larceny" does not mean that § 2119 "require[s] the *same* elements as [its] common-law predecessors." *Carter v. United States*, 530 U.S. 255, 264 (2000) (emphases in original). The canon of imputed common-law meaning has a "limited scope," and the precise elements of a common-law crime "should be imported into statutory text only when Congress employs a common-law *term*, and not when . . . Congress simply describes an offense analogous to a

10

common-law crime without using common-law terms." *Id.* at 264–65; *see United States v. Wells*, 519 U.S. 482, 492 n.10 (1997) (rejecting the "view that any term that is an element of a common-law crime carries with it every other aspect of that common-law crime when the term is used in a statute").

Barnes does not identify any such common-law term of art in the text of § 2119. "Robbery" or "larceny" would qualify, but § 2119 uses neither. Indeed, Congress has used those common-law terms in related criminal statutes, *see* 18 U.S.C. §§ 2112, 2114, 2115, but with § 2119, it instead "followed the more prevalent legislative practice of spelling out" the elements of the crime. *Carter*, 530 U.S. at 266–67 n.5.

Admittedly, it is less clear whether the term "taking," which does appear in § 2119, is itself a common-law term of art. At least four circuits have stated that it is. *See United States v. Figueroa-Cartagena*, 612 F.3d 69, 78 (1st Cir. 2010) ("'Taking' . . . is a common law term of art derived from the law of robbery and larceny."); *United States v. Petruk*, 781 F.3d 438, 442 (8th Cir. 2015) (same); *United States v. Leon*, 713 F. App'x 948, 950–51 (11th Cir. 2017) (same); *United States v. DeLaCorte*, 113 F.3d 154, 156 (9th Cir. 1997) ("We conclude that 18 U.S.C. § 2119, rather than creating a brand new definition of 'taking' for purposes of carjacking, incorporates the understanding of that term as developed under the common law and in other federal robbery statutes.").

But the Supreme Court has strongly suggested otherwise. Specifically, in *Carter v. United States*, the Court interpreted a closely related and similarly worded

11

provision—18 U.S.C. § 2113(a), the federal bank-robbery statute—which makes it unlawful for an individual to "take[], or attempt[] to take," anything of value from a bank "by force and violence, or by intimidation." 530 U.S. at 264–67. Although the statutory crime "bear[s] a close resemblance to the common-law crimes of robbery and larceny," the Court held that the statute did not import every element of those crimes because it did not use any "common-law terms," and so the canon of imputed common-law meaning "ha[d] no bearing" on the statute's language. *Id.*

Moreover, like § 2113(a), § 2119 omits any reference to trespass, possession, or an intent to steal—such as the common-law term "feloniously," the phrase "with intent to steal or purloin," or the phrase "any . . . thing of value belonging to, or in the care, custody, control, management, or possession of," which appear in other robbery-specific statutes contained in the same statutory chapter. *See, e.g.*, 18 U.S.C. §§ 2113(b), 2114(a). The inclusion of those terms in such closely related provisions indicates that "when Congress intended to require the presence of a specific mental state for the commission" of a robbery-specific offense, "it knew how to do so in so many words." *United States v. Brittain*, 41 F.3d 1409, 1414 (10th Cir. 1994), *abrogated on other grounds by Carter*, 530 U.S. at 260. Without any express intent-to-steal requirement, § 2119's text thus departs even further from the common-law definition of robbery, suggesting that the statutory crime of carjacking is broader. *See Carter*, 530 U.S. at 270–71.[2]

---

[2] No doubt, "some situations may call for implying a specific intent requirement into statutory text," so as to avoid "punishing seemingly innocent

For those reasons, we view *Carter* as highly instructive.  Both § 2113(a) and § 2119 use the term "take," and they do so in nearly identical ways.  Because *Carter* rejected the proposition that the term "take," as it is used in § 2113(a), is a common-law term of art, we adopt the same view here.  Thus, § 2119—like § 2113(a)—does not contain any established common-law terms that would make the canon of imputed common-law meaning applicable.  Instead, to "take" a motor vehicle under § 2119 means simply to "acquire[] possession or control" of the vehicle, or to exert dominion over it, regardless of the property's ownership and whether the action is trespassory.  *United States v. Gurule*, 461 F.3d 1238, 1243 (10th Cir. 2006).

## C.

That view is consistent with how our cases applying § 2119 have treated the "taking" element.  As the government points out, our cases have suggested that the "taking" element refers only to the act of acquiring possession of the carjacked vehicle, regardless of whether the defendant does so with a felonious intent.

For example, in *United States v. Gurule*, we called the "taking" element a part of the "actus re[u]s of carjacking."  461 F.3d at 1243.  And to establish a "taking,"

---

conduct in the case of a defendant who peaceably takes [property] believing it to be his."  *Carter*, 530 U.S. at 269.  But this situation does not.  Because carjacking under § 2119 requires that the "taking" be "by force and violence or by intimidation," the statute does not necessarily *also* require a separate intent to steal.  Instead, like § 2113(a), "a general intent requirement suffices" for § 2119 because "a forceful taking—even by a defendant who takes under a good-faith claim of right—falls outside the realm of [ ] 'otherwise innocent'" conduct.  *Id.* at 269–70.  In other words, § 2119's use-of-force requirement, by itself, "separate[s] wrongful from 'otherwise innocent' conduct" without the need for a distinct intent-to-steal or trespass requirement.  *Id.* at 269.

we said, "the government need only show that the defendant engaged in the prohibited conduct"—that is, "acquiring possession or control of the victim's vehicle in the presence of another by force or intimidation." *Id.* Thus, "while the taker's purpose and motives in taking the vehicle have relevance on the issue of whether he had the requisite criminal intent for carjacking . . . (intention to cause death or serious bodily harm), his purpose or state of mind have no bearing on whether he engaged in the prohibited conduct." *Id.* Similarly, in *United States v. Payne*, we held that "[a]n intent to permanently deprive a victim of a motor vehicle is not required by the 'taking' element," such that a "carjacker's motive for stealing the vehicle, be it for profit, convenience or as an instrumentality of another crime, is irrelevant." 83 F.3d 346, 347 (10th Cir. 1996).

To be sure, neither *Gurule* nor *Payne* squarely resolved the issue before us. *Gurule*, for instance, involved a defendant who claimed he did not "take" a motor vehicle because he had only demanded (albeit through the use of force) that the victim give him a ride. 461 F.3d at 1241, 1243. We held that the defendant possessed the requisite intent for a carjacking because he used force to take control over the car—even if he did not intend to *steal* the car. *See id.* at 1243–44. Likewise, *Payne* involved a defendant who abducted certain victims, "commandeered their vehicles, and then abandoned those vehicles once the criminal purpose of the venture was achieved or thwarted." 83 F.3d at 347. Our decision held only that a carjacker possesses the requisite intent under § 2119 regardless of whether their

14

intent is to permanently deprive the victim of the motor vehicle or instead only to temporarily commandeer the vehicle for some other purpose. *Id.*

As such, neither *Gurule* nor *Payne* discussed whether the "taking" itself—even when committed merely by taking temporary possession or control over a vehicle—must be trespassory. And neither addressed the propriety of a claim-of-right defense. Still, both cases make clear that carjacking is only a "general intent crime," *Payne*, 83 F.3d at 347, such that the government need only prove "proof of knowledge with respect to the actus reus of the crime"—that is, that the defendant knew he was "physically taking" the property, *Carter*, 530 U.S. at 269. With that in mind, both *Gurule* and *Payne* support our conclusion that a defendant's good-faith claim of right is not a defense to carjacking under § 2119.

**D.**

Barnes also relies on the absurdity canon to support his reading of § 2119. Under that canon, "interpretations of a statute which would produce absurd results are to be avoided if alternative interpretations consistent with the legislative purpose are available." *Griffin v. Oceanic Contractors, Inc.*, 458 U.S. 564, 575 (1982). Barnes argues that if § 2119 did not permit a claim-of-right defense, it would create absurd results by punishing even "an innocent driver who resists a carjacking by resorting to force"—such as a carjacking victim who uses force to re-take their own vehicle. Aplt. Br. at 23–24.

But that result is not as absurd as Barnes suggests. As the government points out, Congress may well have thought it necessary to disallow a claim-of-right defense

15

in accord with a modern trend among states "of discouraging the use of forcible self-help" to reclaim one's own property. LaFave, *supra*, § 20.3(b) & n.24 (internal quotation marks omitted) (collecting cases). The absurdity canon therefore has no role to play in our interpretation.

Relatedly, as a last resort, Barnes invokes the rule of lenity. The rule of lenity instructs courts, when confronted with a "grievous ambiguity" in a federal criminal statute, to interpret the statute in the defendant's favor. *Muscarello v. United States*, 524 U.S. 125, 138–39 (1998) (quotation omitted). The rule "applies only if, after seizing everything from which aid can be derived," the "grievous ambiguity" remains. *Id.* (cleaned up).

Barnes's reliance on the rule of lenity is equally unavailing. We need not rely on the rule of lenity because other tools of statutory interpretation—along with instructive decisions from our Circuit and from the Supreme Court—provide guidance on the best reading of § 2119: a "taking" for purposes of carjacking occurs when a defendant acquires possession or control of a vehicle, or exerts dominion over it, regardless of the property's ownership and regardless of whether the action is trespassory. Accordingly, no "grievous ambiguity" remains as to the term's meaning. *Muscarello*, 524 U.S. at 138–39 (cleaned up).

Consistent with our interpretation of a "taking," we hold that a defendant's good-faith claim of right is not a defense to carjacking under § 2119. Thus, the district court correctly concluded that Barnes's mistaken belief as to who owned the motorcycle is irrelevant to whether he committed a carjacking. We therefore affirm

16

the district court's denial of Barnes's motion to sever, its grant of the government's motion in limine, and its choice of jury instructions.[3]

### III.

Next, Barnes separately argues that the district court reversibly erred by refusing to give Barnes's requested self-defense instruction as to Count 2, the carjacking-resulting-in-death charge. Barnes claims that he was entitled to a self-defense jury instruction because a jury could find that, when Barnes fatally shot Swenson, the dangerous situation created by the carjacking had dissipated, such that Barnes—although the initial aggressor—had restored his right to use self-defense to fire shots back toward Swenson.

We review "the district court's refusal to give requested instructions for abuse of discretion." *United States v. Cushing*, 10 F.4th 1055, 1073 (10th Cir. 2021)

---

[3] We also note that, even if we were to adopt Barnes's interpretation of § 2119, it would not require reversal because any errors arising from the district court's interpretation would have been harmless or waived. On appeal, Barnes presses three purported errors stemming from the district court's interpretation: he claims the district court erroneously (1) denied his motion to sever his case from his co-defendants, (2) granted the government's motion in limine to exclude evidence of Barnes's mistaken belief as to ownership, and (3) instructed the jury that ownership of the motorcycle was irrelevant to the carjacking-specific counts.

First, as to the denial of Barnes's motion to sever, any error was harmless because Barnes has failed to show that the joint trial with his co-defendants prejudiced him (indeed, Barnes's briefs on appeal do not even address prejudice). Likewise, as to the district court's grant of the government's motion in limine, any error would have been harmless because the district court later reconsidered its ruling and permitted evidence of Barnes's mistaken belief that Busch, not Swenson, owned the motorcycle. Finally, Barnes waived his challenge to the district court's jury instructions because he failed to object to the instructions below—and, in fact, seemingly approved them, *see* R. Vol. III at 1566—and has failed to argue plain error on appeal. *See United States v. Leffler*, 942 F.3d 1192, 1196 (10th Cir. 2019).

17

(cleaned up).  Applying that standard, we hold that the district court did not abuse its discretion by declining to give Barnes's requested self-defense instruction.

At the outset, we note that it remains an open question whether a defendant may ever assert a self-defense claim as an affirmative defense to carjacking resulting in death under 18 U.S.C. § 2119(3).  By his own admission, Barnes's requested self-defense instruction applied only to the "death-results" element of § 2119(3).[4]  *See* R. Vol. III at 1574.  The government, for its part, maintains that § 2119(3) does not permit a self-defense claim in *any* circumstance—let alone on the facts of this case—because self-defense is irrelevant to the death-results element.

As we have explained, the death-results element requires only "but-for causation," meaning that a defendant can be subject to the provision's enhanced penalties if "the carjacking is the but-for cause of a death, irrespective of the defendant's intent in causing that death."  *Lowell*, 2 F.4th at 1295–97 (citations omitted).  The government argues that a self-defense claim is irrelevant to the "death results" element because the element, by requiring only but-for causation between the carjacking and the resulting death, is a strict-liability element.  Thus, the government claims, a defendant's motivation for their conduct that results in death during a carjacking—including when a defendant shoots someone as an act of self-defense

---

[4] The "death-results" element provides that "if death results" from a carjacking, the defendant shall "be fined under this title or imprisoned for any number of years up to life, or both, or sentenced to death."  18 U.S.C. § 2119(3).

18

during a carjacking—cannot serve as an affirmative defense to the "death-results" element.

The government thus gives us reason to question the availability of a self-defense claim under § 2119(3). But whatever questions may linger along those lines, we need not hazard any answers to resolve this appeal. Even assuming that a self-defense claim could apply to carjacking resulting in death under § 2119(3), Barnes still would not be entitled to a self-defense instruction on the facts of this case.

Generally, "a defendant is entitled to an instruction as to any recognized defense for which there is evidence sufficient for a reasonable jury to find in his favor." *Mathews v. United States*, 485 U.S. 58, 63 (1988); *United States v. Toledo*, 739 F.3d 562, 567 (10th Cir. 2014). A defendant carries the burden of production to warrant a self-defense instruction, but that burden is "not onerous." *Toledo*, 739 F.3d at 568. It requires only that there be "evidence sufficient for a reasonable jury to find in [the defendant's] favor." *Id.* at 567. And because the government has the burden of "disprov[ing] a defense of self-defense beyond a reasonable doubt," a defendant "need only produce enough evidence to persuade the jury to have a reasonable doubt about whether the defendant acted in self-defense." *United States v. Barrett*, 797 F.3d 1207, 1218 (10th Cir. 2015).

"Under federal law," a defendant may assert a self-defense claim by showing that, at the time of his conduct, "'he reasonably believe[d] that he [was] in imminent danger of death or great bodily harm, thus necessitating an in-kind response.'" *United States v. Rico*, 3 F.4th 1236, 1239 (10th Cir. 2021) (quoting *Toledo*, 739 F.3d

at 567). But when the defendant is the initial aggressor in the encounter, he is normally unable to assert self-defense. *United States v. Thomas*, 34 F.3d 44, 48 (2d Cir. 1994) ("It has long been accepted that one cannot support a claim of self-defense by a self-generated necessity to kill." (quotation omitted)); *United States v. Abo-Seba*, 267 F. App'x 794, 798 (10th Cir. 2008).

Still, the Supreme Court has held that an exception exists whereby a defendant may be able to assert self-defense "although the defendant originally provoked the conflict." *Rowe v. United States*, 164 U.S. 546, 556 (1896). Specifically, if the defendant "withdraws from [the conflict] in good faith, and clearly announces his desire for peace . . . his right of self-defense, though once lost, revives." *Id.* Thus, under federal law, a defendant who acted as the initial aggressor may still assert self-defense if, at the time of his conduct, (1) he had "withdrawn from the confrontation," (2) he "communicated [his withdrawal]" to the victim, and (3) the "dangerous situation" that he created had "dissipated." *United States v. Desinor*, 525 F.3d 193, 199 (2d Cir. 2008).

But Barnes did none of those things. Barnes argues that he was entitled to a self-defense instruction because, although his involvement in the carjacking made him the initial aggressor, the dangerous situation had dissipated and he had withdrawn from the confrontation by the time Swenson opened fire on him. Relying on his own testimony at trial, Barnes emphasizes that the crossfire between him and Swenson began only after he and his co-conspirators had begun to drive away from the scene, "peacefully trying to leave the property." Aplt. Br. at 28. According to

20

Barnes, that fact demonstrates that he had withdrawn from the confrontation by the time he and Swenson fired at each other. And Barnes suggests that he communicated this withdrawal by telling Swenson that he and his co-conspirators would leave and asking Swenson to put his gun away.

Barnes's argument presupposes that a defendant can withdraw from a confrontation while still committing the underlying crime—here, the carjacking. Our Court has not decided this question. But at least one other circuit has held that even when a defendant *retreats* from the underlying crime, they have not *withdrawn* for purposes of claiming self-defense—or, at least, the "dangerous situation" created by the crime has not sufficiently "dissipated"—if the defendant "remains engaged in the perpetration or attempted perpetration of the crime that he initiated." *Desinor*, 525 F.3d at 199; *see Thomas*, 34 F.3d at 48 ("One who commits or attempts a robbery armed with deadly force, and kills the intended victim when the victim responds with force to the robbery attempt, may not avail himself of the defense of self-defense.").

Moreover, as the government points out, we may look to state-court decisions for guidance because the doctrine of self-defense is a matter of federal common law, which we examine "by drawing upon the common law" generally. *Desinor*, 525 F.3d at 199 (quoting *United States v. Butler*, 486 F.3d 569, 572 n.1 (10th Cir. 2007)); *Wallace v. United States*, 162 U.S. 466, 471–73 (1896). Several states have held that an aggressor has not "withdrawn" as a matter of law if he is still committing the crime that brought about the confrontation with the victim, even if he is trying to leave the victim's presence. *See, e.g.*, *State v. Pride*, 567 S.W.2d 426, 430–31 (Mo.

21

Ct. App. 1978) (defendants who committed robbery were not withdrawing as a matter of law while attempting to escape with the stolen property); *State v. Dennison*, 801 P.2d 193, 617–18 (Wash. 1990) (defendant fleeing from burglary could not assert right of self-defense where crime was still in progress); *Cranmore v. State*, 271 N.W.2d 402, 423 (Wis. Ct. App. 1978) ("Withdrawal means abandoning the enterprise, not leaving the scene." (quotation and footnote omitted)).

We adopt that same view. When a defendant kills a victim while the underlying crime is ongoing, the defendant has no right to engage in self-defense. Even if the defendant begins to abscond or flee the scene, they have not yet withdrawn from the confrontation for purposes of self-defense, and the "dangerous situation" created by the initial crime persists.

That is what happened here. The evidence demonstrates that at the time Barnes fatally shot Swenson, he had not yet withdrawn, but rather was departing the scene of the carjacking—with Swenson's motorcycle still in tow. And even if Barnes's departure could constitute a withdrawal, it is clear that the dangerous situation that Barnes and his co-conspirators created via the carjacking had not yet dissipated. For instance, Barnes's gun remained with him at arm's reach as he fled—as did the guns of his co-conspirators—demonstrating that the situation remained dangerous. *See Desinor*, 525 F.3d at 200 ("As evidence that the dangerous situation created by a defendant's initial crime persisted, courts in armed robbery cases have cited the fact that the defendant['s] . . . gun was always in his hand, prepared to shoot."). And the shooting began mere moments after Barnes, Hedgecock, and

22

Terrell had started to take off with Swenson's motorcycle, further indicating that the cross-fire occurred while the crime was ongoing. *Cf. United States v. Von Roeder*, 435 F.2d 1004, 1010 (10th Cir. 1970) ("[T]he escape phase of a robbery is not an event occurring 'after the robbery.' It is part of the robbery.").

In short, the evidence demonstrates that at the time Barnes fatally shot Swenson, Barnes had not withdrawn from the confrontation and the dangerous situation created by the carjacking had not yet dissipated. Thus, Barnes failed to adduce evidence sufficient as a matter of law to warrant a self-defense instruction, and so the district court did not abuse its discretion by declining to give that instruction. We therefore affirm the district court's refusal to give Barnes's proffered jury instruction.

**IV.**

For the foregoing reasons, we AFFIRM.

Entered for the Court

Allison H. Eid
Circuit Judge